UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| KEVIN LEE HUGHBANKS, | 4:21-CV-04167-KES |
| Plaintiff, | |
| vs. | |
| BRENT FLUKE, Warden, Mike Durfee State Prison, in his individual and official capacity; REBECCA SCHIEFFER, Associate Warden of Operations and Administrative Remedy Coordinator, Mike Durfee State Prison, in her individual and official capacity; ALEJANDRO REYES, Associate Warden of Programs and Americans with Disabilities Act Coordinator, Mike Durfee State Prison, in his individual and official capacity; LAINE SCHRYVERS, Former Ludeman and West Crawford Unit Manager, Mike Durfee State Prison, in their individual capacity; TAMMY DOYLE, Barracks Unit Manager, Mike Durfee State Prison, in her individual and official capacity; SECRETARY SOUTH DAKOTA DEPARTMENT OF HEALTH, Cabinet Secretary, in their individual capacity; DIRECTOR CORRECTIONAL HEALTH SERVICES, Director, All SD DOC Locations, in their individual capacity; MELISSA MAGSTADT, in her official capacity; CHS JANE DOE, Nurse, Mike Durfee State Prison, in her individual and official capacity; MARY CARPENTER, Medical Director, All SD DOC locations, in her individual and | ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

official capacity;[1] STEPHANIE
HAMILTON, Nurse, Mike Durfee State
Prison, in her individual and official
capacity; MIKE LEIDHOLT, Former
Secretary of Corrections, All SD DOC
Locations, in his individual capacity;
TIM REISCH, Former Interim Secretary
of Corrections, All SD DOC Locations,
in his individual capacity; CHS JANE
DOE, Nurse, South Dakota State
Penitentiary, in her individual and
official capacity; SAM BADURE, Unit
Manager and SDSP Prison Rape
Elimination Act Coordinator, South
Dakota State Penitentiary, in his
individual and official capacity; CODY
HANSON, Former Case Manager and
Current Unit Manager, South Dakota
State Penitentiary, in his individual and
official capacity; MELISSA MATURAN,
SDSP Administrative Remedy
Coordinator, South Dakota State
Penitentiary, in her individual and
official capacity; TAMMY TOP, Former
Physician's Assistant, South Dakota
State Penitentiary, in her individual and
official capacity; JESSICA SCHRUER,
South Dakota State Penitentiary, in her
individual and official capacity; DARIN
YOUNG, Former Chief Warden and
Director of Operations, South Dakota
State Penitentiary, in his individual
capacity; JENNIFER DREISKE, Former
Deputy Warden, South Dakota State
Penitentiary, in her individual capacity;
CHARISSA WAREMBOURG, Mailroom
Officer, Mike Durfee State Prison, in her
individual and official capacity;
THOMAS GILCHRIST, Sex Offender

---

[1] Dr. Carpenter is no longer the medical director. Pursuant to Federal Rule of
Civil Procedure 25(d), Dr. Aaron Haynes, her successor (Docket 175 ¶ 3), is
automatically substituted as a defendant for the official capacity claims against
Dr. Carpenter. But Hughbanks's official capacity claims against Dr. Carpenter
are dismissed as moot, so substitution is not necessary.

Management Program
Counselor/Therapist, Mike Durfee State
Prison, in his individual and official
capacity; BRENNA CARLSON, Sex
Offender Management Program
Director, All SD DOC Facilities, in her
individual and official capacity; MARK
STOEBNER, Former Sex Offender
Management Program
Counselor/Therapist, Mike Durfee State
Prison, in his individual and official
capacity; JAMES HENRY, Corporal and
Supervisor of Laundry, Mike Durfee
State Prison, in his individual and
official capacity; SUMMIT FOOD
SERVICE, LLC, Mike Durfee State
Prison, in its individual and official
capacity; UNKNOWN CORRECTIONAL
HEALTH SERVICES EMPLOYEES,
Unknown Positions, Mike Durfee State
Prison, in their individual and official
capacities; SOMP JOHN DOE,
Unknown Contractor for Sex Offender
Management Program, Mike Durfee
State Prison, in his individual and
official capacity; TIFFANY VOIGT, Unit
Coordinator, Mike Durfee State Prison,
in her official capacity; DOUG CLARK,
Deputy Secretary of Corrections,
Former Interim Secretary of Corrections
and Former Executive Director of South
Dakota Board of Pardons and Paroles,
in his individual capacity; TERESA
BITTINGER, Warden of the South
Dakota State Penitentiary, in her official
capacity; KELLIE WASKO, Cabinet
Secretary South Dakota Department of
Corrections, All SD DOC Locations, in
their official capacity; GORDON
SWANSON, Parole Board Member, All
SD DOC Facilities, in his individual and
official capacity; KENNETH ALBERS,
Parole Board Member and Former
Sheriff, All SD DOC Facilities, in his
individual and official capacity; MARK

|  |  |
|---|---|
| SMITH, Parole Board Member, All SD DOC Facilities, in his individual and official capacity; MYRON RAU, Parole Board Member, All SD DOC Facilities, in his individual and official capacity; PAIGE WILBUR BOCK, Parole Board Member, All SD DOC Facilities, in her individual and official capacity; DAVE NELSON, Parole Board Member and Former Prosecutor, All SD DOC Facilities, in his individual and official capacity; KEVIN KRULL, Parole Board Member, All SD DOC Facilities, in his individual and official capacity; ANNE HAJEK, Parole Board Member, All SD DOC Facilities, in her individual and official capacity; ED LIGTENBERG, Parole Board Member and Former Executive Director of South Dakota Board of Pardons and Paroles, All SD DOC Facilities, in his individual and official capacity; GREGG GASS, Parole Board Member, All SD DOC Facilities, in his individual and official capacity; JODY JESSEN, Correctional Officer, Mike Durfee State Prison, in his/her individual and official capacity; ED LOEWE, Lieutenant of Special Investigative Unit, Mike Durfee State Prison, in his individual and official capacity; KIM HALVERSON, Summit Food Service, LLC, Director at Mike Durfee State Prison, in their individual and official capacity; and JARROD ANDERSON, Former Summit Food Service, LLC, Director at Mike Durfee State Prison, in his individual capacity,<br><br>Defendants. |  |

Plaintiff, Kevin Lee Hughbanks, filed a pro se lawsuit under 42 U.S.C.

§ 1983. Dockets 5, 20. Hughbanks alleges that his conditions of confinement at

Mike Durfee State Prison (MDSP) and the South Dakota State Penitentiary (SDSP) violated his constitutional rights. Dockets 5, 20. Hughbanks's claims for deliberate indifference to serious medical needs and conditions of confinement in violation of his Eighth Amendment rights survived screening. Docket 11 at 39–40. His claims alleging the inmate correspondence policy violates his First Amendment rights survived screening. *Id.* at 40. His claims asserting the computer use and tablet policies violate his First Amendment right to access the courts survived screening. *Id.* at 40–41. Finally, his claims alleging that the Sex Offender Management Program policies violate his Fourteenth Amendment right to due process and his Fifth Amendment right to be free from self-incrimination survived screening. *Id.* at 41.

Defendants Kenneth Albers, Sam Badure, Teresa Bittinger, Brenna Carlson, Dr. Mary Carpenter, Doug Clark, Director Correctional Health Services, Unknown Correctional Health Services Employees,[2] CHS Jane Doe, SOMP John Doe, Tammy Doyle, Jennifer Dreiske, Brent Fluke, Gregg Gas, Thomas Gilchrist, Anne Hajek, Stephanie Hamilton, Cody Hanson, James Henry, Jody Jessen, Kevin Krull, Mike Leidholt, Ed Ligtenberg, Ed Loewe, Melissa Maturan, Dave Nelson, Myron Rau, Tim Reisch, Alejandro Reyes, Rebecca Schieffer, Jessica Schruer, Laine Schryvers, Mark Smith, Secretary South Dakota Department of Health Melissa Magstadt, Joan Adam, Mark

---

[2] Hughbanks has not identified any of the unnamed and Doe defendants named in his amended complaint, and his time for doing so has expired. *See* Docket 142. Thus, Hughbanks's claims against Unknown Correctional Health Services Employees, CHS Jane Doe, and SOMP John Doe are dismissed without prejudice.

Stoebner, Gordon Swanson, Tammy Top, Tiffany Voigt, Charissa Warembourg, Kellie Wasko, Paige Wilbur Bock, and Darin Young move for summary judgment.[3] Docket 171.

## FACTUAL BACKGROUND

Because defendants move for summary judgment, the court recites the facts in the light most favorable to Hughbanks. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). But Hughbanks did not respond to defendants' statement of undisputed material facts. Docket 182. Local Civil Rule 56.1(D) provides, "All material facts set forth in the movant's statement of material facts will be deemed to be admitted unless controverted by the opposing party's response to the moving party's statement of material facts." D.S.D. Civ. LR 56.1(D). The court deems all the statements in defendants' statement of undisputed material facts to be admitted. *Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001) (stating that a plaintiff's pro se status does not excuse him from responding to a motion for summary judgment "with specific factual support for his claims to avoid summary judgment[]") (citing Fed. R. Civ. P. 56(e)).

---

[3] This order refers to these parties moving for summary judgment collectively as defendants, but there are other defendants who have filed a motion for summary judgment that will be addressed in a separate order. *See* Docket 204 (defendants Summit Food Service, LLC, Kim Halverson, and Jarrod Anderson's motion for summary judgment).

## I.      Administrative Remedy Process

The South Dakota Department of Corrections (DOC) has an administrative remedy process found in Policy 1.3.E.2. Docket 173 ¶ 5. The policy requires an inmate to exhaust his administrative remedies by first submitting an Informal Resolution Request (IRR). *Id.* ¶ 8. DOC staff have ten days to respond to the IRR. *Id.* ¶ 9. If an inmate does not believe his grievance has been resolved through the IRR process, he has ten days to submit a Request for Administrative Remedy form. *Id.* ¶¶ 10, 11. A Request for Administrative Remedy must be clear, legible, and to the point, and must include specific information. *Id.* ¶ 13. Requests for Administrative Remedy are documented in the Comprehensive Offender Management System (COMS). *Id.* ¶ 12. DOC staff have thirty days to investigate a Request for Administrative Remedy and generate a response to the inmate. *Id.* ¶ 14. Responses to a Request for Administrative Remedy are documented. *Id.* ¶ 15. Inmates receive the original response, and a copy of the response is scanned into COMS. *Id.* The administrative remedy process policy provides that "any request submitted by an inmate that is incomplete or illegible will be returned to the inmate. All requests for remedy returned to an inmate that do not include a response to the request will include a written statement explaining the reason the request was returned." *Id.* ¶ 16. When a Request for Administrative Remedy is rejected, the inmate may resubmit a Request for Administrative Remedy within the allowed timeframe, but if the inmate does not resubmit the request, the inmate has not exhausted administrative remedies. *Id.* ¶ 28. *See also* Docket 182 ¶ 69.

7

## II.    Medical Claims

### A.    Sleep Apnea and Acid Reflux

In approximately July 2021, there was a bed bug infestation at MDSP. Docket 182 ¶ 73. The bed bugs burrowed into the wooden head of bed wedges some inmates had in their possession. *Id.* To eliminate the bed bug infestation, orders for bed wedges were discontinued, and all the existing bed wedges were burned to eradicate the bed bug infestation. *Id.* ¶¶ 74, 75. Hughbanks suffers from sleep apnea and acid reflux. Docket 20 at 11. He was issued a bed wedge to alleviate these conditions. *Id.* When orders for bed wedges were discontinued, Health Services educated inmates who had been issued a bed wedge on alternative ways to alleviate symptoms for acid reflux. Docket 182 ¶ 76.

Hughbanks alleges[4] that bed wedges were taken away because an inmate's fiancé had contacted the media about the bed bug infestation. Docket 20 at 12. On July 22, 2021, Hughbanks filed a grievance alleging that he was being retaliated against because his bed wedge had been taken away. Docket 182 ¶ 77; Docket 172-80 at 4. Hughbanks's grievance requesting a bed wedge was denied. Docket 172-80 at 1. He was informed that "[b]ed wedges have been removed from the units due to health and sanitation issues with them. Medical

---

[4] The allegations in Hughbanks's amended complaint are insufficient to defeat a motion for summary judgment. *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir 2007) (stating that allegations unsupported by specific facts or evidence are insufficient to overcome summary judgment). The court has included Hughbanks's allegations merely to provide context for the undisputed facts supported by competent record evidence.

has offered a treatment plan to inmates for medical issues associated with having a bed wedge." *Id.* Hughbanks was also advised to request a sick call if the recommended treatment plan is not sufficient to address his ongoing medical issues. *Id.* The DOC was working to address the bed bug infestation before the media was notified. Docket 182 ¶ 80.

## B.   Shoulder Pain

### 1.   Extra Pillows

Hughbanks alleges that in 2006 or 2007 a provider at MDSP issued a medical order to issue two additional pillows to alleviate Hughbanks's right and left shoulder pain. Docket 20 at 14. The pillows decreased Hughbanks's shoulder pain. *Id.* When Hughbanks was transferred to MDSP in December 2019, he was not permitted to have extra pillows because of a 2014 comfort care memo. *Id.*

### 2.   Left Shoulder Pain

Hughbanks's claims related to his left shoulder pain arise out of the treatment he received following surgery on October 19, 2018. *Id.* at 20. On October 19, 2018, Hughbanks had left shoulder surgery. Docket 182 ¶ 91. The surgery was uneventful, and Hughbanks was discharged back to the DOC after the surgery. Docket 172-8 at 5. On discharge, per the surgeon's orders, Hughbanks was in a sling for comfort, and he was provided a PolarCare ice machine to be used as tolerated. *Id.* Hughbanks's surgeon prescribed Norco[5] to

---

[5] Norco is the brand name of a medication containing a combination of acetaminophen and hydrocodone. *See* https://www.drugs.com/norco.html

be distributed by the DOC and directed that Hughbanks be seen in ten to fourteen days for postoperative reassessment. *Id.* at 6. On October 30, 2018, Tammy Top, CNP, initialed the operative report, which included the post-operative plan. *Id.* at 172-8 at 2.

On October 24, 2018, Hughbanks submitted a kite about "severe pain in shoulder from surgery[]" and "severe pain in pelvic area, lower abdomen and lower back from lack of bowel activity since Thursday[.]" Docket 172-9 at 1. Hughbanks was seen in sick call on October 24, 2018. *Id.* at 2–4; Docket 182 ¶ 92. Hughbanks was having significant constipation following his surgery. Docket 182 ¶ 92. Because hydrocodone can cause and worsen constipation, Hughbanks was prescribed acetaminophen and ibuprofen. *Id.*; Docket 172-9 at 5. Dr. Regier, who is not named a defendant, gave the orders during the October 24, 2018, sick call. Docket 172-9 at 5.

On October 30, 2018, Hughbanks had an orthopedic post-operative follow-up appointment. Docket 182 ¶ 93. The orthopedic provider discontinued the shoulder sling, recommended ice as needed and physical therapy, and ordered Norco for pain. *Id.*; Docket 172-10. Top is identified as the referring doctor/PA and initialed the orthopedic provider's report on October 30, 2018. Docket 172-10. On November 6, 2018, an initial physical therapy note was submitted. Docket 182 ¶ 94. Hughbanks reported that "he continues to have

---

(last visited Mar. 25, 2024). Lortab, the medication mentioned in Hughbanks's amended complaint, is the brand name of another medication containing a combination of acetaminophen and hydrocodone. *See* https://www.drugs.com/lortab.html (last visited Mar. 25, 2024).

pain due to not having the correct medication prescribed for him. He states he is taking Tylenol and Ibuprofen only . . . [and] should have something heavier." Docket 172-11 at 1. Hughbanks reported pain of 8/10. *Id.* Top initialed the November 6, 2018, physical therapy note on November 19, 2018. *Id.* On November 8, 2018, Hughbanks reported a nice response to therapy with improvement to 80% range of motion in left shoulder. Docket 182 ¶ 94.

On November 27, 2018, Hughbanks sent a kite about hearing issues, ear pain and pressure, and "pain in shoulder from surgery. Tylenol and Ibuprofen has never done anything to relieve pain." Docket 172-12 at 1. Hughbanks was seen the same day by AMG Orthopedics for a six-week post-operative follow-up appointment. *Id.* at 3. Hughbanks rated the pain in his left shoulder at 6/10. *Id.* at 5. He reported that had been using ice and Tylenol as needed for pain. *Id.* The orthopedic provider recommended that Hughbanks continue to work with physical therapy and use ice and Tylenol as needed for pain control. *Id.* at 6. Hughbanks agreed with the plan of care. *Id.*

### 3.   Right Shoulder Pain

Hughbanks alleges that he has pain in his right shoulder, accompanied by grinding, clicking, and popping of the joint. Docket 20 at 17. He claims that medical staff who treated him have noticed the grinding, clicking, and popping. *Id.* He asserts that Correctional Health Services staff at the SDSP and Dr. Carpenter refused to allow the orthopedic surgeon who treated his left shoulder to treat his right shoulder. *Id.* at 17–18. According to Hughbanks, Top told him that it is normal to live with pain daily. *Id.* at 18. Since being transferred to

MDSP, Hughbanks alleges that he continued to have right shoulder pain and that Correctional Health Services staff, along with Dr. Carpenter, refuse to provide him any treatment other than Tylenol, ibuprofen, occasional injections, and physical therapy. *Id.* He alleges that Tylenol and ibuprofen provide no relief and that injections provide only temporary relief. *Id.* Hughbanks claims that physical therapy is not helpful, as it is always discontinued after a few sessions because he has full range of motion and strength in his shoulder. *Id.* According to Hughbanks, Correctional Health Services staff and Dr. Carpenter refused to order an MRI or schedule an examination with a specialist to attempt to alleviate his constant pain. *Id.*

During a post-operative visit after his left shoulder surgery, Hughbanks reported pain in his right shoulder. Docket 172-19 at 3. The outside provider did not make any recommendations to address Hughbanks's right shoulder pain complaint. *Id.* at 4. On May 31, 2019, Hughbanks sent a kite requesting a bottom/middle bunk for shoulder pain. Docket 172-22 at 1. Hughbanks was seen in Health Services the same day that he submitted a kite, but Hughbanks informed the nurse that his primary complaint was itching. *Id.* at 3. None of the defendants whom Hughbanks alleges were deliberately indifferent to his right shoulder pain were involved in the May 31, 2019, sick call. *Id.* at 3–5. On July 23, 2019, Hughbanks submitted a kite renewing his request for "bottom bunk order due to shoulders. Was ignored last sick call." Docket 172-23 at 1. Hughbanks also reported right shoulder pain that had been unaddressed and requested an orthopedic appointment and injections. *Id.* Hughbanks was seen

that day at sick call, and a provider chart review was placed. *Id.* at 6. Two days later, Dr. Regier ordered x-rays of both shoulders, due to complaints of chronic bilateral shoulder pain. Docket 172-24. The radiologist concluded that Hughbanks had mild acromioclavicular osteoarthritis and no significant abnormality in his right shoulder. *Id.* at 1.

Hughbanks was seen at sick call on August 14, 2019, for pain in his shoulders, hips, feet, ankles, and knee and to discuss his July 23 kite following the provider chart review. Docket 172-25 at 1. Dr. Regier is the provider who saw Hughbanks on August 14, 2019. *Id.* at 3. Dr. Regier discussed the x-ray results with Hughbanks, explaining that there is no definite treatment for curing or slowing down the osteoarthritic process but provided some recommendations to protect the joints from excessive stress and trauma. *Id.* at 1. Dr. Regier's assessment was "[m]ultiple arthralgias including both shoulders, left greater than right, both hips, both feet and ankles, and left knee." *Id.* at 2. Because Hughbanks complained of pain in multiple joints, Dr. Regier explained that there could be side effects if multiple joint injections are given during an appointment. *Id.* Hughbanks was in a bottom bank, and Dr. Regier recommended that he continue in a bottom bunk because Hughbanks reported he gets increased pain in his left shoulder when he climbs up in the top bunk. *Id.* at 1.

Hughbanks was seen by an outside orthopedic provider on September 23, 2019, for left shoulder pain. Docket 172-26 at 2. There is no reference to right shoulder pain in the orthopedic note. *Id.* at 1–5. But on September 27,

2019, when Hughbanks was seen at sick call following his orthopedic appointment, Hughbanks reported that he had pain in his right shoulder similar to the pain in his left shoulder. Docket 172-27 at 1. Dr. Regier recommended a physical therapy evaluation for Hughbanks's bilateral shoulder pain. *Id.* at 2. During the physical therapy evaluation on October 10, 2019, Hughbanks indicated that he would prefer to have a home exercise program only, and the physical therapist agreed that would be appropriate based on his minimal reports of discomfort and functional strength and range of motion. Docket 172-28 at 1–2. Following this evaluation, Dr. Regier ordered a home exercise program for Hughbanks. *Id.* at 3.

During an appointment with an outside orthopedic provider on November 25, 2019, for a recheck of his left shoulder, Hughbanks reported right shoulder pain of 6/10 and requested that the provider examine his right shoulder. Docket 172-30 at 2. The orthopedic provider advised Hughbanks that the orthopedic clinic would be happy to see Hughbanks for his right shoulder complaints after approval. *Id.* at 4.

On December 27, 2019, Hughbanks presented to sick call for multiple issues, including right shoulder pain. Docket 172-31 at 2. The provider, Alyssa Welbig, NP, recommended Tylenol and ibuprofen, ice, heat, and rest for the right shoulder pain. *Id.* at 5. The provider noted that physical therapy had previously been ordered, but Hughbanks refused physical therapy. *Id.* On January 14, 2020, Hughbanks submitted a kite reporting that the pain in his shoulders has been getting worse and requested two extra pillows. Docket 172-

14

32 at 1–2. The nurse who assessed Hughbanks at sick call did not detect noticeable tenderness or deformity to the shoulders and informed Hughbanks that medical will not order comfort items. *Id.* at 4.

On January 23, 2020, Hughbanks was evaluated by a physical therapist at Avera Therapy for left knee pain and right shoulder pain. Docket 172-33 at 1. The physical therapist noted that Hughbanks had near full range of motion of the right shoulder with minimal pain. *Id.* at 2. Hughbanks was discharged from physical therapy on January 30, 2020, because he was independent with his home exercise programs, and there was not much else physical therapy could do for his chronic issues. *Id.* at 5.

Hughbanks submitted a kite requesting a CPAP, two extra pillows, and treatment for Raynaud's syndrome on January 29, 2020. Docket 172-34. A nurse practitioner, who is not a named defendant, saw Hughbanks at sick call on February 4, 2020, regarding the requests in his kite. Docket 172-35. Hughbanks reported that Tylenol and ibuprofen do not help much with his shoulder pain, but he was not interested in treatment other than extra pillows. *Id.* at 2. The provider reminded Hughbanks that Health Services does not order pillows and recommended that he continue with the exercises and stretches previously provided by physical therapy, ice, rest, and Tylenol and ibuprofen. *Id.* 3. Hughbanks was also instructed to follow up if needed. *Id.*

On May 11, 2020, Hughbanks submitted a kite requesting to drop the bottom/middle bunk order, renewal of ibuprofen and acetaminophen, a telehealth appointment with his orthopedic surgeon due to pain in his

15

shoulders and hips, and renewal of the theraband for home exercises. Docket 172-36 at 1–2. Hughbanks was seen at sick call on March 12, 2020, and it was noted that he has full range of motion but constant pain at a level of 5/10. *Id.* at 4–6. Hughbanks explained that he wanted the bottom/middle bunk order discontinued because that was related to his left shoulder surgery. *Id.* at 6. He wanted the theraband renewed because it had been helpful. *Id.* The nurse who assessed Hughbanks at sick call initiated an advanced-level provider chart review. *Id.* at 7. The bottom/middle bunk order was discontinued pursuant to Hughbanks's request. *Id.* at 9.

On September 15, 2020, Hughbanks was assessed at sick call based on a kite he had submitted regarding pain in his shoulders and hips and requesting injections and an orthopedic referral. Docket 172-37 at 1–9. A physician assistant who is not a defendant saw Hughbanks the same day. *Id.* at 10–17. Hughbanks reported intermittent right shoulder pain. *Id.* at 12. On examination, Hughbanks had full range of motion and good muscular tone and strength. Docket 175 ¶ 42. The provider informed Hughbanks that outside appointments were very limited due to an increase in COVID-19, but he received bilateral shoulder injections and was instructed to follow up for a recheck in one month. Docket 172-37 at 15–17.

Hughbanks submitted a kite on October 19, 2020, requesting to see a provider for shoulder pain. Docket 172-39 at 1. According to the kite, the injections provided only minimal pain relief and Tylenol and ibuprofen did not help. *Id.* He was assessed by a nurse at sick call the next day and scheduled

16

for an appointment with a provider. *Id.* at 5. Dr. Wallinga saw Hughbanks on

November 20, 2020, for bilateral shoulder pain. Docket 172-40. Dr. Wallinga

informed Hughbanks that it was too soon for another shoulder injection. *Id.* at

4.

On December 17, 2020, Hughbanks submitted a kite requesting a

change in pain medication because Tylenol and ibuprofen were not helping his

shoulder pain. Docket 172-41 at 1–2. He was assessed at sick call the next day

by a nurse who is not a defendant. *Id.* at 6. There was no loss of motion, no

crepitus with movement, full range of motion, and he did not appear to be in

distress. *Id.* 5–6. He was instructed to return if the issue continues or worsens.

*Id.* at 5.

On April 3, 2021, Hughbanks submitted a kite complaining of right

shoulder pain that worsened when carrying a 15–20 pound bucket. Docket

172-45 at 1. He requested an appointment with an orthopedic surgeon and

additional pain medication. *Id.* Hughbanks was seen at sick call the same day.

*Id.* at 3. He rated his right shoulder pain as 9/10. *Id.* at 5. The nurse who

assessed Hughbanks recommended warm packs four times a day as needed,

rest, ice, applying compression, and elevation. *Id.* at 6. He was advised to

return if the issue continues or worsens. *Id.* Four days later, Hughbanks

underwent x-rays ordered by a provider who is not a defendant. Docket 172-

46. The right shoulder x-ray demonstrated degenerative changes of the right

acromioclavicular joint, but no fracture, dislocation, or other osseous

abnormality. *Id.* at 1. On April 8, 2021, Hughbanks signed a refusal for

physical therapy because "he has done physical therapy already and was told his issue was not a strength issue." Docket 172-47 at 3.

On May 3, 2021, Hughbanks submitted a kite alleging that Health Services refused to do anything about his right shoulder pain and refused to allow his orthopedic surgeon to treat his right shoulder pain. Docket 172-48. He reported that his shoulder pain has been getting worse, and that he now has "pain, numbness, and tingling from finger tips to shoulder." *Id.* at 2. Hughbanks was seen for a provider appointment on May 6, 2021. *Id.* at 3–8. He reported that pain in his right shoulder had progressed over the past few months but had not noticed any restricted motion. *Id.* at 4. Dr. Wallinga performed an examination and found that Hughbanks's right shoulder had fairly normal range of motion, but there was pain with passive range of motion above shoulder height. *Id.* at 6. The rotator cuff appeared intact, but significantly tender. *Id.* Hughbanks was prescribed a steroid, and Dr. Wallinga requested authorization to add right shoulder evaluation to the orthopedic consult that had already been approved for low back pain and MRI review. *Id.* at 7. Because Hughbanks reported that his right shoulder did not respond to a previous injection, an injection was not repeated during this appointment. *Id.*

In response to an informal resolution requesting right shoulder surgery, Health Services informed Hughbanks on June 2, 2021, that he must complete physical therapy prior to re-requesting surgery. Docket 172-50.

On June 17, 2021, Hughbanks submitted a kite reporting that the pain in his right shoulder has been getting worse and requesting an MRI and

18

"surgery to fix." Docket 172-51 at 2. The kite dated June 17, 2021, included seven other complaints. *Id.* at 1–2. When he was seen at sick call regarding this kite, he stated that he has had right shoulder pain for ten years, has gone to physical therapy a couple of times, and has been told again that he can go through physical therapy, but the therapist said they cannot do anything more for him. *Id.* at 5. He reported numbness and tingling and pain regardless of his arm position. *Id.* He rated his pain at 7–8/10. *Id.* According to Hughbanks, his shoulder became worse in February while carrying something heavy at work. *Id.* The nurse who assessed Hughbanks indicated that he would be scheduled to see a provider for his pain and encouraged him to use ice and/or heat. *Id.* at 6.

Because of right arm numbness, Hughbanks was evaluated by an outside physical therapist on July 19, 2021. Docket 172-52. Although Hughbanks complained of right shoulder pain, he was unable to reproduce the pain that day. *Id.* at 1. He had full range of motion and 5/5 strength, with no pain on palpation. *Id.* He was prescribed physical therapy twice a week for two weeks. *Id.*

On September 27, 2021, Hughbanks submitted a kite with numerous concerns, including pain, grinding, and popping in his right shoulder. Docket 172-53 at 1. Again, Hughbanks requested an MRI, "pain relief medication that will actually relieve pain," an epidural, and surgery. *Id.* Hughbanks was seen at sick call on September 28, 2021. *Id.* at 3–6. The nurse who assessed

Hughbanks requested a provider chart review and recommended that Hughbanks apply warm packs to his joints prior to stretching. *Id.* at 6.

Hughbanks submitted a kite on October 28, 2021, complaining of continued right shoulder pain. Docket 172-54 at 2. The nurse who assessed Hughbanks at sick call on October 28, 2021, recommended that he continue taking meloxicam and acetaminophen for pain control and to rest his shoulder as much as possible. *Id.* at 8.

### C.   Comfort Care Memo

In 2014, Dr. Mary Carpenter, who was the medical director, and Bob Dooley, who was the former warden at SDSP, issued a memo clarifying that Correctional Health Services' responsibility to provide medical treatment does not include providing for comfort items such as, but not limited to, special shoes, long underwear, fans, single cells, medical showers, extra mattresses, pillows, and/or blankets. Docket 172-68. Because the role of Health Services is to provide medical treatment, Health Services will not order comfort items. *Id.*; Docket 182 ¶ 191. Comfort items can pose security issues if inmates use the items as "status" inside of the facility or utilize those items to barter for other items. Docket 182 ¶ 192. Additionally, inmates can conceal contraband in pillows, mattresses, or other comfort items. *Id.* ¶ 193. Because outside medical consultants may not consider potential security issues when recommending comfort items, recommendations from outside clinics for comfort items are not necessarily ordered by the DOC internal medical providers. *Id.* ¶¶ 194, 196. The comfort care memo does not require inmates to disclose medical

information to non-medical DOC employees. *Id.* ¶ 197. If Hughbanks disclosed medical information to non-medical DOC employees, it was his choosing to do so. *Id.* ¶ 198.

### D.   Cold Sensitivity

Hughbanks claims that he suffers from severe pain in his extremities when the temperature is below 65 degrees Fahrenheit. Docket 20 at 22. He alleges that he had been issued gloves, thermals, extra socks, and extra bedding to alleviate his pain. *Id.* But when he returned to the SDSP in 2017, Schruer and Young refused to re-issue these items. *Id.* When Hughbanks was transferred to MDSP in mid-December 2019, Fluke, Reyes, Schieffer, Doyle, and Schryvers refused to re-issue the items. *Id.*

On August 30, 2017, Hughbanks presented to Health Services complaining of cold sensations in his hands and reporting that he has Raynaud's syndrome. Docket 182 ¶ 148. The provider examined him and noted that he did not have the typical physical findings for Raynaud's syndrome and ordered lab workup. *Id.* On September 14, 2017, Hughbanks was seen at Health Services for complaints of cold sensations in his upper extremities as well as his legs. *Id.* ¶ 149. Although Hughbanks did not complain of the physical findings usually seen with Raynaud's syndrome, Hughbanks again stated that he had been diagnosed with Raynaud's syndrome. *Id.* The provider's assessment was "[p]rior presumptive diagnosis of Raynaud's, not proved." *Id.* The provider ordered more lab testing, which came back normal. *Id.* ¶¶ 149, 150. On October 3, 2017, Hughbanks was seen at Health Services for cold

sensations in his upper extremities. *Id.* ¶ 151. The provider noted that "[h]e described this as a cold sensation around the entire circumference of both forearms [but] really not involving the hands and more specifically the fingers. He stated he had a presumptive diagnosis of 'Raynauds.' " *Id.* (quoting Docket 172-64 at 1) (first alteration in original). The provider's assessment was low B12 level, subjective complaints of cold sensation in both arms, and subjective complaints of fatigue. Docket 172-64 at 2. Lab tests were ordered at Hughbanks's request, and he received a B12 injection. *Id.*

On October 25, 2017, Hughbanks went to Health Services and requested extra clothes, blankets, and lay-in showers based on his belief that he has Raynaud's Syndrome. Docket 182 ¶ 152. The provider who evaluated Hughbanks documented that he "has been worked up by Dr. Regier and has not been formally diagnosed with Raynaud's but he has been diagnosed with vitamin B12 deficiency." Docket 172-66 at 2. Hughbanks was informed that he does not qualify for medical showers because he does not have problems with mobility or an open draining wound. *Id.* Hughbanks was also advised that he may purchase extra clothes from commissary and that Health Services does not issue comfort items. *Id.*

On January 26, 2018, Hughbanks presented at Health Services reporting that he had been misdiagnosed with Raynaud's syndrome, his skin is so cold it is painful, and that he had previously been placed on vitamin B12 but saw no improvement in his symptoms. Docket 182 ¶ 153. B12 deficiency causes damage to peripheral nerves, and patients often complain of tingling and/or

numbness of the hands and feet. *Id.* ¶ 154. Some patients describe the tingling, or neuropathy, as a "cold" feeling as with numbness. *Id.* ¶ 155.

On February 1, 2018, Hughbanks was seen by a nurse at sick call for a complaint of "sensation of coldness–'like an icepack.' " Docket 175 ¶ 69 (quoting Docket 172-65 at 1). Hughbanks was scheduled for the provider clinic to address this issue. *Id.* When Hughbanks was seen by a provider, he complained only about ongoing left shoulder pain and denied any further medical concerns. Docket 182 ¶ 157. Hughbanks did not again report any cold sensitivity complaints until January 14, 2020, *id.* ¶161, although he submitted numerous kites and was seen multiple times in Health Services between February 1, 2018, and January 14, 2020, *id.* ¶¶ 159–160.

On January 14, 2020, Hughbanks submitted a kite reporting that the pain he feels from the cold is getting worse. Docket 172-32 at 1. He stated that he had been diagnosed with Raynaud's syndrome but he and Dr. Regier both believe that "it is more than that because not limited to hands and feet." *Id.* Hughbanks requested to see a specialist and extra blankets, socks, thermal tops and bottoms, and gloves. *Id.* Hughbanks was assessed by a nurse at sick call the same day and informed that Health Services does not provide comfort items. *Id.* at 3. If his symptoms persisted, the plan was to submit an order for a provider sick call. *Id.*

Hughbanks submitted a kite on January 29, 2020, requesting "to see Dr. Regier regarding his last sick call to get treated for Reynaud's [sic] Syndrome." Docket 175 ¶ 77 (quoting Docket 172-34 at 2). When seen at sick call the next

day, Hughbanks stated if he cannot get thermals, extra blankets, and gloves, he wanted a medication for the nerve pain caused by his Raynaud's syndrome. *Id.* A provider referral order was generated. *Id.* A provider saw Hughbanks on February 4, 2020. Docket 172-35. Although the provider was unsure whether Hughbanks had been diagnosed with Raynaud's, the provider ordered amitriptyline to help with his "nerve pain." *Id.* at 3.

Hughbanks submitted an ADA request for extra blankets on October 9, 2020, that Reyes rejected because there was no record of Hughbanks having Raynaud's syndrome. Docket 182 at ¶ 166. Raynaud's syndrome is a problem with the distal circulation of the digits of the hands and feet, not a nerve problem. Docket 175 ¶ 80. Hughbanks was not prescribed amitriptyline for Raynaud's syndrome but rather for a possible nerve problem, resulting in feelings of cold. *Id.* On October 19, 2020, Hughbanks submitted a kite stating that he "[n]eed[ed] to see Dr. Wallinga regarding Raynaud's Syndrome and treatment to prevent pain." Docket 172-39 at 1. The next day, when seen by Health Services, Hughbanks complained of "Raynauds pain." *Id.* at 5. According to Hughbanks, he was "told he has this by the provider but was told later by medical that he does not have this." *Id.* Hughbanks rated his Raynaud's pain at 0/10 "as it is not cold out[.]" *Id.* A provider sick call was ordered. *Id.*

On November 20, 2020, Dr. Wallinga saw Hughbanks. Docket 172-40. Hughbanks reported that

> [H]e has always had cold hands and feet. He becomes cold on the rest of his body fairly quickly. He is always wishing he had a sweatshirt on. He said he was sent to the SHU last week and all of his "stuff" was stolen from him, including his sweatshirt, new shoes, and new orthotics. He would like to have orders written for another sweatshirt, gloves, and extra clothing. [H]e said [Dr. Wallinga] told him he may have had Raynaud's in the past and he needs to have that treated.

*Id.* at 2. To address Hughbanks's complaint of feeling cold, Dr. Wallinga planned to check his thyroid function and recommended that he discuss his clothing concerns with DOC because "[h]e would benefit from keeping his extremities warm and not being exposed to prolonged cold." *Id.* at 4.

Hughbanks submitted a kite requesting medication so that the cold would not affect him as much. Docket 182 ¶ 170. On December 22, 2020, Hughbanks was seen at sick call regarding his request for medication for his "cold problem." *Id.* ¶ 171. Hughbanks reported that he had stopped taking the medication for his "cold problem" in July because he was sweating a lot, but he believed that it helped when he was taking it. Docket 172-42 at 1. The nurse placed a chart review request to renew amitriptyline. *Id.* at 2. Hughbanks was seen at provider sick call on January 4, 2021. Docket 172-43. The provider reviewed the results of the lab studies that had been ordered for Hughbanks and prescribed amitriptyline for a possible nerve problem causing him to feel cold. Docket 182 ¶ 172. If there was no improvement with amitriptyline, the plan was to increase the dosage or request a neurology appointment. *Id.* Hughbanks was seen on February 8, 2021, for a nursing recheck after

restarting amitriptyline. Docket 172-60. He reported that the "pain is still there but not as bad." *Id.* at 1.

After being restarted on amitriptyline on January 5, 2021, Hughbanks remained on that medication, although the dosage varied. Docket 182 ¶ 177. Hughbanks submitted one kite requesting a renewal but did not submit other kites or complain to Health Services about his "cold problem" or possible Raynaud's syndrome after the February 8, 2021, nursing recheck. *Id.* ¶¶ 176–178.

The DOC does not issue gloves, thermals, or extra socks unless an inmate works outside, and they are required for their job. *Id.* ¶ 180. Inmates may purchase socks, sweatpants, and sweatshirts at the commissary. *Id.* While at MDSP, Hughbanks resided in Ludeman Hall and West Crawford Hall. *Id.* The average temperature in each of these halls is 70–72 degrees. *Id.* The temperature in the common areas of these halls does not fall below 65 degrees. *Id.* The temperature in an inmate's room does not fall below 65 degrees unless the inmate opens the window during cold weather. *Id.*

### D.    Boxer Briefs

Hughbanks claims that he suffers from inner thigh chafing caused by the boxer shorts and pants provided by the DOC. Docket 20 at 25. On May 31, 2019, Hughbanks submitted a kite regarding chafing and stated that he had boxer briefs when he was incarcerated in 2014. Docket 182 ¶ 183. Hughbanks requested powder. *Id.* On October 25, 2019, Hughbanks requested a renewal of GoldBond powder, stating that the powder had been "highly helpful for chaffing

[sic]." *Id.* ¶ 184. Hughbanks submitted a kite complaining of pain in his groin area and requesting a medical order for boxer briefs on January 14, 2020. *Id.* ¶ 185. The nurse who assessed Hughbanks informed him that boxer briefs are a comfort item that will not be ordered by medical. Docket 172-32 at 4. This nurse is not a named defendant *Id.* at 6. *See generally* Docket 20 at 25–27. On May 11, 2020, Hughbanks submitted a kite to renew GoldBond powder for chafing. Docket 182 ¶ 186.

On September 15, 2020, Hughbanks was seen in Health Services for itching in his groin area. *Id.* ¶ 187. He was prescribed an antifungal medication. *Id.* On February 17, 2021, Hughbanks requested that medical provide boxer briefs to prevent chafing. *Id.* ¶ 188. He was informed that medical does not issue boxer briefs because they are considered a comfort item and advised to continue to use GoldBond powder. *Id.* GoldBond powder is an appropriate medical treatment for chafing. Docket 175 ¶ 102. Further, inmates may purchase boxer briefs at the commissary. Docket 182 ¶ 188.

## III.   Conditions of Confinement Claims

### A.   Sanitation

#### 1.   Flies in the Dietary Building

Hughbanks alleges that there is a large infestation of flies in the dietary building at MDSP. Docket 20 at 29–32. DOC staff takes measures to prevent flies from entering the dietary building. Docket 174 ¶ 13. The doors have air flow barriers to prevent flies from coming in, and there are fly strips and electronic fly traps. *Id.* Each door has air curtains to help keep the flies out of

27

the building if the door is open. Docket 182 ¶ 204. DOC staff routinely cleans out the air curtains. *Id.* ¶ 205. Summit Foods/Aramark, private companies that have contracted with the DOC to provide food services, also have electronic fly traps. *Id.* ¶ 206. Since the Spring of 2022, the entire dietary building has been air conditioned. Docket 174 ¶ 11.

The Department of Health inspects the dietary building annually. Docket 182 ¶ 207. In 2019 and 2021, MDSP received a rating of 100/100. Docket 172-76 at 1; Docket 172-78 at 1. In 2020, MDSP receiving a rating of 99/100. Docket 172-77 at 1. In 2022, MDSP received a rating of 96/100. Docket 172-79 at 1.

### 2.    Floors of the Dietary Building

Hughbanks alleges that the floors in the dietary building are filthy and unsanitary. Docket 20 at 32. The floor in the dining hall is concrete with a protective layer on top. Docket 182 ¶ 217. Overtime, the floor looks worn, but the floors are swept and mopped after every meal service. Docket 174 ¶¶ 15, 16, 17. A commercial cleaning product is used in accordance with required health codes. Docket 182 ¶ 221.

### B.    Air Handling System

Hughbanks alleges that the air handling system in the dietary building is inadequate and jeopardizes the health of all who eat and work there. Docket 20 at 35. He claims the system appears to have no air infiltration, resulting in visible lint, dust, and hair in the air. *Id.* He also claims that the system contains inflatable ducts that deflate when the system shuts down during a fire

alarm. *Id.* at 35–36. When the alarm is cleared, the ducts rapidly reinflate and send lint, dust, and hair into the air. *Id.* at 36.

The dietary building has an air filtration system with ducts that move to supply air circulation. Docket 176 ¶ 6. If the air filtration system shuts down, the ducts deflate and then reinflate. *Id.* The air filtration system does not shut down while inmates are eating, but MDSP does not have control over whether the air filtration system may shut down due to a power outage. *Id.* ¶ 7. The air filtration system is cleaned at least twice a year. *Id.* ¶ 8. MDSP's physical plant manager has not received complaints regarding lint, dust, or hair in the air and on surfaces. *Id.* ¶¶ 1, 9.

Prior to spring 2022, the dietary building had an air circulation system with exhaust fans in the windows to blow hot air out and additional fans to circulate the air. *Id.* ¶ 10. Fans were mounted on the walls near the exit doors to help with air circulation. *Id.* ¶ 11. Summit Foods also had fans in the dietary building. Docket 182 ¶ 232. As of spring 2022, the dietary building has a central air conditioning system. Docket 176 ¶ 14. The air conditioning unit in the dietary building has filters, which are changed approximately five times a year. *Id.* ¶ 13.

### C.   Utensils and Tables

Hughbanks alleges that the tables and utensils used in the dietary building are "unsanitary" and "incapable of being truly cleaned and sanitary." Docket 20 at 38, 40. When a table clears after the inmates have finished eating, dietary building staff cleans the table for the next group of inmates to

29

dine. Docket 182 ¶ 238. All tables are cleaned and wiped down after every meal. *Id.* ¶ 239. All utensils are also cleaned after every meal. *Id.* Utensils are run through the dishwasher, and the dishwasher is routinely inspected to confirm the washing temperature is appropriate. *Id.* ¶ 240.

### D.    Laundry

Hughbanks alleges that because of a DOC policy that was implemented in 2021 that allows inmate laundry workers to refuse to do an inmate's laundry if the inmate puts sheets or blankets inside their mesh laundry bags, on one occasion, April 27, 2021, his clothing was not washed because he hid a sweatshirt inside a pillowcase, which can be laundered in an inmate's mesh laundry bag. Docket 20 at 42. Each inmate is allowed to have their clothes laundered daily, Monday through Friday. Docket 177 ¶ 3. Each inmate is allowed to have their sheets laundered every Tuesday. *Id.* ¶ 4. Each inmate is allowed to have their blankets laundered once a month. *Id.* ¶ 5. Inmates are provided mesh laundry bags. *Id.* ¶ 6. Inmates place dirty laundry in the mesh bag and then place the mesh bag on the laundry cart. *Id.* Runners take the laundry cart to the laundry room, do the laundry, and then return the clean clothes to the respective units. *Id.* Each clothing item contains the inmate's inmate number so that any items lost in laundry can be returned. *Id.* ¶ 9.

### E.    Paper Towels

The restrooms in the living units at MDSP do not have paper towels, but each inmate is issued two hand towels to dry their hands. Docket 182 ¶ 262.

The hand towels may be washed every day. *Id.* ¶ 263. Inmates are encouraged not to share their hand towels with other inmates. *Id.*

### F.   Nutrition

Hughbanks alleges that Summit Food Services often runs out of certain food items and makes substitutions of lesser quantity and nutritional value. Docket 20 at 73–77. He alleges that prison staff refuses to address this issue and informed him that the substitutions meet nutritional requirements. *Id.* Because of the alleged lack of nutritious meals, Hughbanks alleges his immune system has been compromised and his bone and joints have deteriorated and degenerated. *Id.* at 75.

Hughbanks submitted five grievances claiming that he was not receiving a nutritionally balanced meal because the food service ran out of a certain food item and had to make a substitution. Docket 182 ¶¶ 272, 274, 275, 276. From time to time, food services run out of food due to supply chain issues, which were exacerbated by COVID-19, and substitutions are then made. *Id.* ¶ 270. The substitutions are appropriate to meet daily nutritional needs. *Id.* ¶¶ 271, 273, 274, 275.

On May 24, 2017, Hughbanks's weight was 259 pounds, and on June 7, 2023, his weight was 288 pounds. *Id.* ¶ 277. Throughout his incarceration, Hughbanks's weight fluctuated in this range, which demonstrates that he was not malnourished. *Id.* When Hughbanks's albumin level was checked, it was normal. *Id.* Protein malnutrition can result in a low albumin level. *Id.* When Hughbanks was seen at Health Services, or at an outside appointment, each

31

provider noted that he was "well-nourished." *Id.* ¶ 279. When he was seen at Health Services on September 15, 2020, Hughbanks requested a Boost supplement because he was experiencing constant muscle fatigue with minimal energy. Docket 172-37 at 2. During provider sick call, Hughbanks reported that he has " 'chronic fatigue' and has experienced it for many years." *Id.* at 12. He reported that prior to incarceration, he fell asleep at stoplights. *Id.* Hughbanks did not attribute his fatigued and low energy to inadequate nutrition. *Id.* On examination, the provider noted that he had good muscular tone and strength. *Id.* at 14. Hughbanks again requested Boost on October 19, 2020, and a nurse scheduled an appointment for blood tests to check for vitamin and mineral deficiency. Docket 182 ¶ 284. The blood tests revealed that Hughbanks had a vitamin D deficiency but that his vitamin B12 deficiency had been corrected. *Id.* ¶ 285. The provider discontinued Hughbanks's vitamin B12 supplement and increased his vitamin D supplement. *Id.* ¶ 286.

On June 17, 2021, Hughbanks requested an order for Boost or Premier Protein at every meal so that he could have no carbohydrates, increase his protein intake, and lose weight. Docket 172-51 at 1. Hughbanks was informed that Boost and high protein supplements are provided only to patients who have an illness and need extra healing and calories. *Id.* at 3. Hughbanks was encouraged to eat more eggs, peanut butter, nuts, and meats to increase his protein intake. *Id.* On October 29, 2019, Hughbanks again requested "Boost, Ensure, or something with protein, vitamin and mineral supplements" because he felt lethargic. Docket 182 ¶ 289. A provider examined Hughbanks and

advised him that he could purchase vitamins from the commissary. Docket
172-54 at 12–15. Hughbanks purchased a multivitamin. Docket 178 ¶ 25.

## IV.    Inmate Correspondence Policy

The DOC has a policy regarding inmate correspondence. Docket 172-70;
Docket 172-89. Incoming mail at MDSP is processed in accordance with the
inmate correspondence policy. Docket 179 ¶ 2. The policy provides for
monitoring and inspection of inmate correspondence to prevent escapes, detect
and deter the introduction of contraband, and to maintain order, control, and
safety in the facility. *Id.* ¶ 3. Prior to December 2021, the policy mandated that
incoming envelopes must be white, with some exceptions for religious and
educational organizations and attorney-client communications. *Id.* ¶ 4.
Stickers, tape, self-adhesive labels, including return address labels, sealing
wax and sticky or foreign substances not originally part of the envelope were
not permitted on the envelope. *Id.* Crayon, paint, marker, colored pencil, or
chalk marking on the envelope was not permitted. *Id.* Mailroom staff removed
cancelled postage stamps. *Id.* Unused postage stamps, unused envelopes, and
blank paper in incoming mail were not permitted. *Id.* ¶ 5. Envelopes that did
not meet the requirements were returned unopened to the sender with a brief
description of the reason the envelope was rejected. *Id.* ¶ 4. The rule against
colored envelopes, postage labels, and certain drawings on envelopes was
implemented to prevent the introduction of contraband into the facility. *Id.*
¶¶ 6–8.

Incoming and outgoing correspondence that is not considered privileged legal correspondence may be opened and inspected for contraband. Docket 182 ¶ 312. Correspondence to the NAACP, the Bureau of Indian Affairs, parole authorities, the SDSP Warden, and the National Commission on Correctional Healthcare is not considered legal and may be opened. *Id.* ¶¶ 312, 318. Correspondence to the Center for Constitutional Rights is considered legal correspondence. Docket 179 ¶ 13. Incoming correspondence from the DOC is not considered legal and may be opened and inspected. Docket 182 ¶ 314. But incoming correspondence from DOC administration that is clearly marked as such or marked as legal is considered privileged, legal correspondence. *Id.* ¶ 315.

## V.      Access-to-the-Courts Claims

### A.      Printing Charges

MDSP's Indigent Inmates Operational Memorandum (3.3.C.7) provides that "[t]he DOC and MDSP recognize that all inmates have a right of access to state and federal courts." Docket 172-71 at 3. In accordance with the Indigent Inmates Operational Memorandum, non-indigent inmates with positive account balances are charged $0.05 cents per page to print or copy legal documents. Docket 182 ¶ 333; Docket 172-71 at 3. Indigent inmates are allowed $2.00 in copies (40 pages) each month. Docket 182 ¶ 335; Docket 172-71 at 4. If an indigent inmate has used his monthly allotment of legal copies and faces a deadline that requires additional copies to timely file initial legal pleadings in the same month, the Indigent Inmates Operational Memorandum provides that

34

the indigent inmate should inform the unit coordinator of the need to make legal copies of the initial pleadings. Docket 182 ¶ 335; Docket 172-71 at 4. Hughbanks was transferred to MDSP on December 11, 2019. Docket 182 ¶ 332. After his transfer to MDSP, Hughbanks was not considered indigent. *Id.* ¶ 336.

**B.    Legal Typing**

At MSDP, a computer lab is available for inmates to use for legal typing. *Id.* ¶ 348. There are five computers in the computer lab equipped with Microsoft Word and connected to a printer. *Id.* ¶ 349. Inmates may schedule a time to use a computer in the lab. *Id.* ¶ 350. If an inmate has not signed up for computer lab time and there is an available computer, prison officials will permit an inmate to use the available computer. *Id.* ¶ 351. It is not common for all five computers to be scheduled for use all day, and at times, all five computers are available. *Id.* ¶ 352. Inmates are not permitted to have computers in their cells due to security concerns. *Id.* ¶ 344; Docket 172-87 at 3.

**C.    Prisoner Trust Account Report Charges**

DOC Policy 1.1.B.2, *Offender Accounts and Financial Responsibility*, provides that any inmate "requesting statement of their accounts will be charged $0.50 per statement and must have funds within their spend account." Docket 172-73 at 10. When an inmate submits a PLRA form to the business office, the inmate must include a signed commissary slip for the 6 months required at $0.50 per monthly statement. *Id.* If an inmate is indigent

35

and requests a statement required by the Prison Litigation Reform Act (PLRA), "the costs will be added to the inmate's credit obligations." *Id.* Because a Prisoner Trust Account Report requires six months of statements to be attached, the report is a running statement. Docket 178 ¶ 17. Accessing and printing a monthly statement is not equivalent to making a copy, so the cost is different. *Id.* ¶ 18. The banking staff has to run the monthly statements individually from COMS and print each month requested, which is why the policy provides for a $0.50 per statement charge. *Id.* ¶ 17. When an inmate requests a statement, the business office typically provides the requested statement to an inmate less than one week after receiving the commissary slip and PLRA form. *Id.* ¶ 19. On August 25, 2021, Hughbanks took out a $2.48 loan for his PLRA statements. Docket 182 ¶ 380.

## VI.    Sex Offender Management Program Claims

Following his conviction, Hughbanks was in the Sex Offender Management Program (SOMP). Docket 181 ¶ 4. When an inmate enters the SOMP, the inmate is asked about past behavior including whether there is a background for sexual abuse, but the inmate is not asked to provide identifying information. *Id.* ¶¶ 5–6. Thus, the inmate is not required to disclose incriminating information or to identify any victims. *Id.* ¶ 6. On December 4, 2016, Hughbanks's term of incarceration expired, and he began serving his suspended sentence term. Docket 20 at 84. On May 23, 2017, Hughbanks took a maintenance polygraph that indicated deception. Docket 182 ¶ 389. Hughbanks then took a specific issue polygraph that also showed deception.

*Id.* ¶ 390. When an offender is taking a polygraph, it is made clear to the offender that the offender is not being asked to incriminate himself, but matters admitted during the polygraph could result in termination. Docket 181 ¶ 14. During the 2017 polygraph, Hughbanks admitted to committing actions that violated his parole. *Id.* ¶ 15. On June 2, 2017, Hughbanks was terminated from his sex offender treatment group for violating specific rules and conditions of his signed treatment contract with Dakota Psychological Services. Docket 182 ¶ 391. Hughbanks's parole was officially revoked on February 11, 2019, after a hearing with the Parole Board. *Id.* ¶ 392. Hughbanks appealed his parole revocation, and the circuit court affirmed the Amended Findings of Fact and Conclusions of Law of the South Dakota Board of Pardons and Paroles. Docket 172-98. Hughbanks appealed the circuit court's order to the South Dakota Supreme Court, and the court issued a judgment on September 24, 2020, affirming the circuit court's order. Docket 172-99.

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or by showing that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To avoid summary judgment, a

plaintiff may not rely solely on the allegations in the complaint but must substantiate his allegations with sufficient probative evidence. *Wilson v. Miller*, 821 F.3d 963, 970 (8th Cir. 2016). In this case, Hughbanks's complaint and amended complaint are not verified. Docket 1 at 83; Docket 20 at 96–97. Hughbanks did not respond to defendants' motion for summary judgment. Simply put, Hughbanks has not submitted any affidavits, record materials, or other probative evidence supporting the allegations in his amended complaint. Thus, the court must grant defendants' motion for summary judgment if the motion, supporting materials, including the facts considered undisputed show that the defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e)(3).

Prisoners who proceed pro se are entitled to the benefit of liberal construction at the pleading stage. *Quam v. Minnehaha Cnty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987). Nonetheless, the summary judgment standard set forth in Rule 56 of the Federal Rules of Civil Procedure remains applicable to prisoners proceeding pro se. *Id.* The district court is not required to "plumb the record in order to find a genuine issue of material fact." *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996). Courts must remain sensitive, however, "to the special problems faced by prisoners attempting to proceed pro se in vindicating their constitutional rights, and [the Eighth Circuit does] not approve summary dismissal of such pro se claims without regard for these special problems." *Nickens v. White*, 622 F.2d 967, 971 (8th Cir. 1980). "[W]hen dealing with summary judgment procedures technical rigor is inappropriate

where . . . uninformed prisoners are involved." *Ross v. Franzen*, 777 F.2d 1216, 1219 (7th Cir. 1985).

## II.    Claims for Declaratory and Injunctive Relief

Hughbanks's amended complaint seeks declaratory and injunctive relief for each of the claims that survived screening. *See generally* Docket 20. Hughbanks has now completed his sentence and is not in custody or on parole. *See Offender Locator*, S.D. Dep't of Corr., https://doc.sd.gov/adult/lookup/ (last visited Mar. 11, 2024). Because Hughbanks is no longer imprisoned at MDSP or SDSP and subject to the conditions that give rise to his claims for declaratory and injunctive relief, defendants contend that Hughbanks's claims for declaratory and injunctive relief are moot and should be dismissed. Docket 172 at 8–9.[6]

"[A] prisoner's claim for injunctive relief to improve prison conditions is moot if he or she is no longer subject to those conditions." *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) (citing *Wycoff v. Brewer*, 572 F.2d 1260,

---

[6] Defendants' summary judgment submissions misconstrue, in part, the court's 1915A Screening order. For example, the screening order provides that Hughbanks's "claims for conditions of confinement in violation of his Eighth Amendment rights against Fluke, Reyes, Schieffer, Henry, Voigt, and Clark in their official capacities for injunctive relief only, against Fluke, Reyes, Schieffer, Henry, and Reisch in their individual capacities, and against Summit Foodservice survive § 1915A screening." Docket 9 at 40, ¶ 3. But defendants contend that "the Defendants that survived screening on this claim [for dirty floors], are Fluke, Reyes, and Schieffer, who survived only in their official and individual capacities for injunctive relief only." Docket 182 ¶ 222; *see also id.* ¶¶ 236, 243, 260, 265. Defendants' argument is not correct. The individual capacity claims against Fluke, Reyes, and Schieffer, as well as Henry and Reisch, are claims for monetary damages, which are discussed later in this order.

1262 (8th Cir. 1978)). Because he has completed his sentence and is no longer in custody, Hughbanks's claims for injunctive and declaratory relief are moot and dismissed.[7] *See Brazil v. Ark. Dep't of Human Servs.*, 892 F.3d 957, 960–61 (8th Cir. 2018) (recognizing that when an issue is moot, a court must dismiss the claim for lack of jurisdiction); *Smith v. Hundley*, 190 F.3d 852, 855 (8th Cir. 1999) (holding that an inmate's claims for declaratory relief in a § 1983 action are moot if the inmate is transferred and no longer subject to the alleged unlawful policies and conduct). Defendants are entitled to summary judgment on Hughbanks's claims for injunctive and declaratory relief, and the official capacity claims against defendants are dismissed.

## III.   Administrative Exhaustion Under the Prison Litigation Reform Act

The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). *See also Booth v. Churner*, 532 U.S. 731, 740 (2001). This mandatory exhaustion requirement applies broadly to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534

---

[7] For some of his claims, Hughbanks requests an apology letter as injunctive relief. Docket 20 at 17, 19, 21, 24, 26, 29, 39, 46, 68, 80–81. "An apology for past wrongdoing is not prospective injunctive relief and is not the type of relief that is cognizable in a § 1983 action against a state official in his official capacity." *Kesterson v. Kent State Univ.*, 345 F. Supp. 3d 855, 886 (N.D. Ohio 2018).

U.S. 516, 532 (2002); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in [federal] court." (citation omitted)). The PLRA requires "immediate dismissal" of all unexhausted claims. *Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005). "It is reversible error for the district court to proceed to the merits of a prison condition claim if the prisoner has not exhausted all his available remedies." *Kader v. Dooley*, 2019 WL 4227361, at *4 (D.S.D. Sept. 5, 2019) (citing *Benjamin v. Ward City*, 632 F. App'x 301, 301 (8th Cir. 2016) (per curiam)).

Before filing this action, Hughbanks was required to fully and properly exhaust his administrative remedies as to each claim in the amended complaint. *See Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003). To properly exhaust administrative remedies, Hughbanks must comply with the DOC's procedures. *Woodford v. Ngo*, 548 U.S. 81, 102 (2006) ("[P]roper exhaustion" under the PLRA requires prisoners to comply with the prison's deadlines and procedures). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Bock*, 549 U.S. at 218.

Defendants contend that Hughbanks has failed to exhaust his administrative remedies for the following claims: (1) that the primary air handling system is inadequate and jeopardizes health and well-being; (2) that there is "massive infestation of flies" in the dietary building; (3) that his laundry

41

is being returned unwashed; (4) that he is permitted only one shift per week to do legal typing; (5) the denial of legal typing, legal materials, and a laptop computer; and (6) that the utensils in the dietary building are rarely clean because they are not soaked in a solution of detergent and water. Docket 172 at 12. The court will address defendants' failure to exhaust defense when the court considers each of these claims.

## IV.   Qualified Immunity Standard

Defendants argue they are entitled to qualified immunity because their actions did not violate Hughbanks's constitutional rights. Docket 171 at 6; Docket 172 at 7–8. To determine whether a government official is entitled to qualified immunity, the court considers (1) whether the facts alleged, viewed in the light most favorable to plaintiff, demonstrate the official's conduct violated a constitutional right, and (2) whether the constitutional right was clearly established at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The court may consider the elements in any order, and if either of the elements is not met, then the official is entitled to qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

## V.   Medical Claims

### A.   Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "This is true whether the indifference is

manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05 (footnotes omitted). "This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Id.* at 105. "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. Allegations of negligence will not suffice, nor will mere disagreement with treatment decisions. *See Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000).

The deliberate indifference standard includes both an objective and subjective component. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). The plaintiff "must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Id.* (citing *Coleman*, 114 F.3d at 784). "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman*, 114 F.3d at 784 (citation and internal quotation omitted). To be liable for deliberately disregarding medical needs, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

## B.   Sleep Apnea and Acid Reflex

Hughbanks alleges that defendants were deliberately indifferent to his serious medical needs by discontinuing the order for his bed wedge. Docket 20 at 12. Hughbanks brings this claim against Fluke, Dr. Carpenter, Hamilton, Doyle, Leidholt, and Reisch.[8] It is undisputed that all bed wedge orders were discontinued in the summer of 2021 because of "health and sanitation issues with them," a bed bug infestation. Docket 172-80 at 1; *see also* Docket 182 ¶ 74. It is also undisputed that Health Services offered treatment plans to inmates for medical issues associated with having a bed wedge and that Hughbanks was directed to request a sick call if the offered treatment plan was not sufficient to address his medical issues. Docket 172-80 at 1. Hughbanks has not demonstrated that defendants were deliberately indifferent to his serious medical needs by disposing of bed wedges. *Dulaney*, 132 F.3d at 1239 ("[I]nmates have no constitutional right to receive a particular or requested course of treatment[.]").

## C.   Shoulder Pain

### 1.   Extra Pillows

Hughbanks alleges that defendants were deliberately indifferent for failing to order or provide extra pillows to alleviate his shoulder pain. Docket 20

---

[8] The court addresses only the individual capacity claims against defendants that survived screening and have not been dismissed pursuant to the court's previous orders.

at 14–17. He brings this claim against Young, Dreiske, Dr. Carpenter, Badure, Schruer, Maturan, Fluke, Doyle, Reyes, Schieffer, and Schryvers. *Id.* at 16. It is undisputed that comfort items can pose a security risk. Docket 182 ¶¶ 192–193. It is also undisputed that Health Services recommended and ordered other modalities to alleviate Hughbanks's shoulder pain. *See supra* at 9–20. Defendants are entitled to summary judgment on Hughbanks's claim that they were deliberately indifferent for failing to order or provide extra pillows to alleviate his shoulder pain.

### 2. Left Shoulder

According to Hughbanks, the surgeon's nurse told him that the "surgery he had was one of the most painful surgeries performed[]" and that a catheter would normally be inserted into the shoulder to provide morphine. Docket 20 at 20. Because a catheter was not a viable option due to Hughbanks's incarceration, Hughbanks alleges that the decision was made to prescribe Lortab for thirty days. *Id.* According to Hughbanks, Dr. Saloum immediately discontinued the Lortab prescription and directed Hughbanks to continue with Tylenol and ibuprofen, which provided no noticeable relief. *Id.* Hughbanks claims that he was subjected to "continued, excruciating pain during the ensuing days due to the refusal of Defendants CHS, Top, and Saloum[]" to prescribe Lortab after his left shoulder surgery. *Id.* at 20–21. This claim remains pending only against Top. Thus, the court must consider whether Top was deliberately indifferent to Hughbanks's post-operative shoulder pain based on the undisputed facts.

45

Hughbanks's orthopedic surgeon recommended a "prescription of Norco . . . to be distributed by the Department of Corrections." Docket 172-8 at 5–6. Hughbanks alleges that Dr. Saloum, not Top, made the decision to prescribe Tylenol and ibuprofen. Docket 20 at 20. Hughbanks alleges that Tylenol and ibuprofen provided no noticeable relief, but he has not submitted any evidence that Top was aware of this complaint. On October 30, 2018, Hughbanks had an orthopedic follow-up appointment. Docket 182 ¶ 93. The orthopedic provider discontinued the shoulder sling, recommended ice as needed and physical therapy, and ordered Norco for pain. Docket 172-10. Top is identified as the referring doctor/PA and initialed the orthopedic provider's report on October 30, 2018. *Id.* Top also reviewed the report with Hughbanks and ordered to "cont. current meds." *Id.* When Top issued this order, there is no evidence that she was aware that Hughbanks had reported that his current medications provide no noticeable relief. But even if she were, Hughbanks does not have a constitutional right to receive the specific pain medication suggested by an outside orthopedic provider. *Dulaney*, 132 F.3d at 1239 ("[P]rison doctors remain free to exercise their independent medical judgment."); *see also Hensley v. Montgomery Cnty.*, 2006 WL 156733, at *5 (E.D. Mo. Jan. 20, 2006) ("[E]ven when a prison physician has failed to follow the recommendation of outside specialists, the prison doctor will not be displaying deliberate indifference if the doctor used her independent professional judgment when choosing the particular course of treatment.") (internal citation and quotation omitted)). Although it is undisputed that Hughbanks disagreed with Top's treatment

46

decisions, he does not have a constitutional right to receive a particular or requested course of treatment. *Dulaney*, 132 F.3d at 1239. Top is entitled to summary judgment on this claim.

### 2.   Right Shoulder

Hughbanks alleges that he has pain in his right shoulder, accompanied by grinding, clicking, and popping of the joint. Docket 20 at 17. He claims that medical staff who treated him have noticed the grinding, clicking, and popping. *Id.* He asserts that Correctional Health Services staff at the SDSP and Dr. Carpenter refused to allow the orthopedic surgeon who treated his left shoulder to treat his right shoulder. *Id.* at 17–18. According to Hughbanks, Top told him that it is normal to live with daily pain. *Id.* at 18. Since being transferred to MDSP, Hughbanks alleges that he continued to have right shoulder pain and that Correctional Health Services staff, along with Dr. Carpenter, refuse to provide him any treatment other than Tylenol, ibuprofen, occasional injections, and physical therapy. *Id.* He alleges that Tylenol and ibuprofen provide no relief and that injections provide only temporary relief. *Id.* Hughbanks claims that physical therapy is not helpful, as it is always discontinued after a few sessions because he has full range of motion and strength in his shoulder. *Id.* According to Hughbanks, Correctional Health Services staff and Dr. Carpenter refuse to order an MRI or schedule an examination with a specialist to attempt to alleviate his constant pain. *Id.*

As previously noted, because Hughbanks has not identified any of the unknown Correctional Health Services staff who allegedly were deliberately

indifferent to his right shoulder pain, the claims against the unknown Correctional Health Staff are dismissed without prejudice. Although Hughbanks alleges that Top told him that it is normal to live with daily pain, Docket 20 at 18, he had not come forward with any evidence to support his allegations.[9] Similarly, he has not submitted any evidence that Dr. Carpenter was aware of his right shoulder pain complaints, requests to see a specialist, or schedule an MRI. Without such evidence, Hughbanks's claim against Dr. Carpenter for deliberate indifference to his right shoulder pain fails as a matter of law.

Hughbanks also alleges that Fluke, Young, Dreiske, and Maturan "allowed [CHS and Dr. Carpenter] . . . to ignore the issue and not provide real treatment." Docket 20 at 18. But again, Hughbanks has not come forward with any evidence that any of these defendants were aware of his right shoulder pain complaints. Further, vicarious liability is inapplicable to § 1983 actions. *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010). Because Hughbanks has not offered any evidence that Dr. Carpenter, Fluke, Young, Drieske, and Maturan were personally involved in the alleged deliberate indifference to his

---

[9] To support their motion for summary judgment, defendants submitted a record from an assessment Top performed on October 25, 2017. Docket 172-66. During that assessment, Top documented that she informed Hughbanks that "expecting to be pain free is not always a reasonable request as this may not be possible." *Id.* at 2–3. This statement was made in response to Hughbanks's frustration that Health Services would not issue or order extra clothing in response to his complaints of cold sensitivity. This statement, when considered in context based on the undisputed facts regarding the response to Hughbanks's cold sensitivity complaints, is insufficient to establish deliberate indifference.

right shoulder pain, defendants are entitled to summary judgment on this claim.

Defendants are also entitled to summary judgment on this claim because "mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Langford v. Norris*, 614 F.3 445, 460 (8th Cir. 2010) (quotation omitted). The nurses and providers who assessed Hughbanks for his right shoulder pain complaints did not ignore those complaints. As outlined in the Factual Background section (*see supra* at 11–20), when Hughbanks complained of right shoulder pain, he was assessed and treatment recommendations were provided based on the assessment, albeit not the specific treatment that Hughbanks has requested. But "inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." *Dulaney*, 132 F.3d at 1239. (internal citation omitted).

## D.   Cold Sensitivity

Hughbanks alleges that Schruer, Young, Fluke, Reyes, Schieffer, Doyle, and Schryvers were deliberately indifferent to his serious medical needs because they refused to issue gloves, thermals, extra socks, and extra bedding to help reduce pain when exposed to temperatures below 65 degrees. Docket 20 at 22–23. Although Hughbanks alleges that each of these defendants are personally aware of his pain when exposed to cold, there is no record evidence to support these allegations. Hughbanks has failed to come forward with evidence to support an essential element of his deliberate indifference to

49

serious medical needs against these defendants. The deliberate indifference standard includes a subjective element. Hughbanks must demonstrate that each of these defendants was aware of his pain complaints and deliberately disregarded them. There is no such evidence in the record. Further, the undisputed facts establish that Health Services addressed Hughbanks's cold sensitivity complaints. *See supra* at 21–26. For these reasons, Schruer, Young, Fluke, Reyes, Schieffer, Doyle, and Schryvers are entitled to summary judgment on Hughbank's claim for deliberate indifference to his cold-induced pain complaints.

### E.   Boxer Briefs

Hughbanks claims that he suffers from inner thigh chafing caused by his boxer shorts and pants provided by the DOC. Docket 20 at 25. He claims that in February 2014, Dr. Wallinga ordered that Hughbanks exchange his regular boxer underwear for boxer-brief underwear to reduce chafing and provide support. *Id.* But when Hughbanks returned to the SDSP in 2017, CHS staff at the SDSP and MDSP refused to issue boxer-brief underwear. *Id.* The underwear Hughbanks requests is a comfort care item, which means that he cannot obtain the item from Health Services, and non-medical staff will not provide boxer-brief underwear without a medical order. *Id.* Hughbanks brings this claim against Schruer, Schryvers, Doyle, Reyes, Fluke, Dr. Carpenter and Young. *Id.* at 25–26. According to Hughbanks's amended complaint, Schruer, Schryvers, Doyle, Reyes, and Fluke refused to provide boxer-brief underwear, but Hughbanks had not proffered any record evidence to support this

allegation or to establish that the alleged refusal was made with the requisite intent. Hughbanks named Dr. Carpenter and Young as defendants because they allegedly issued the comfort care memo, but Hughbanks has not submitted any evidence that either Dr. Carpenter or Young were aware of his chafing complaints. As with his cold-induced pain complaints, Hughbanks has failed to come forward with evidence to support an essential element of his deliberate indifference to serious medical needs claim against these defendants. Further, it is disputed that Health Services provided alternative, appropriate treatment for Hughbanks's chafing complaints that Hughbanks reported was effective. *See* Docket 182 ¶¶ 183–188. Defendants Schruer, Schryvers, Doyle, Reyes, Fluke, Dr. Carpenter, and Young are entitled to summary judgment on Hughbanks's claim for deliberate indifference to complaints of inner thigh chafing.

### F.   Comfort Care Memo

Hughbanks claims that the comfort care item policy is intended to deny him pain relief. Docket 20 at 27. He also contends that the policy requires inmates to provide confidential medical information to DOC employees who are not medical personnel. *Id.* Hughbanks brings this claim against Young, Clark, Fluke, Dr. Carpenter, and Leidholt. *Id.* at 29. It is undisputed that the comfort care memo is intended to address legitimate security concerns. Docket 182 ¶¶ 192–193. It is undisputed that the comfort care memo does not require inmates to disclose medical information to non-medical DOC employees and that if Hughbanks did so, it was his own choosing. *Id.* ¶ 198. It is also

51

undisputed that Health Services provided alternative, appropriate treatment recommendations for Hughbanks's complaints of shoulder pain, cold sensitivity, and chafing. *See supra* at 9–20, 21–26, 26–27. Finally, Hughbanks has not submitted any evidence that Young, Clark, Fluke, Dr. Carpenter, or Leidholt were aware of his complaints of shoulder pain, chafing, or cold sensitivity. For all these reasons, defendants are entitled to summary judgment on this claim.

## VI.   Conditions of Confinement Claims

### A.   Legal Standard

"[T]he Constitution 'does not mandate comfortable prisons'; it prohibits 'inhumane ones.'" *Williams v. Delo*, 49 F.3d 442, 445 (8th Cir. 1995) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). The United States Supreme Court has clarified that only "extreme deprivations" that deny "the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citation and internal quotation omitted). The Supreme Court has listed as basic human needs "food, clothing, shelter, medical care, and reasonable safety[.]" *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (internal quotation omitted). In order to prevail on an Eighth Amendment conditions of confinement claim, a prisoner must prove that: (1) objectively, the deprivation was sufficiently serious to deprive him of the minimal civilized measures of life's necessities, or to constitute a substantial risk of serious harm to his health or safety; and (2) subjectively, the defendants were deliberately

indifferent to the risk of harm posed by the deprivation. *Simmons v. Cook*, 154 F.3d 805, 807 (8th Cir. 1998) (citing *Farmer*, 511 U.S. at 834). An Eighth Amendment challenge to conditions of confinement must examine the totality of the circumstances. *Villanueva v. George*, 659 F.2d 851, 854 (8th Cir. 1981). Even if no single condition would be unconstitutional in itself, the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment. *See id.*; *see also Tyler v. Black*, 865 F.2d 181, 183 (8th Cir. 1989).

### B.    Sanitation

#### 1.    Flies in the Dietary Building

Hughbanks alleges that there are large infestations of flies in the dietary building at MDSP. Docket 20 at 29. Hughbanks brings these claims against Fluke, Reyes, and Schieffer.[10] *Id.* at 29–31. Defendants contend that Hughbanks has not exhausted his administrative remedies regarding this claim. Docket 172 at 12–14. On August 25, 2020, Hughbanks submitted a grievance concerning his complaint that there is a "massive infestation of flies in the Dietary Building." Docket 182 ¶ 64; Docket 172-93 at 4. On August 31, 2020, an IRR was provided to Hughbanks stating, "Thank you for your concern in this matter. It has been forwarded to the appropriate supervisor for any additional action if needed." Docket 182 ¶ 64; Docket 172-93 at 3. Hughbanks filed a Request for Administrative Remedy on September 3, 2020, because the

---

[10] Hughbanks also brings this claim against Summit Food Service, Anderson, and Halverson, *see* Docket 20 at 31, which will be addressed when the court considers these defendants' motion for summary judgment.

"I.R.R. Response showed no action is intended." Docket 172-93 at 2.

Hughbanks requested "immediate steps be taken to eliminate the infestation

. . . including a climate control system that would allow for doors to be closed."

*Id.* Hughbanks's Request for Administrative Remedy was rejected because a

Request for Administrative Remedy "may only address one grievance per

request." *Id.* at 1. *See also* Docket 182 ¶ 64. Hughbanks did not submit

another Administrative Remedy Request after his first was rejected. Docket 182

¶ 64. Because it is undisputed that Hughbanks did not fully exhaust his

administrative remedies regarding flies in the dietary building, defendants are

entitled to summary judgment on this claim.

### 2. Floors in the Dietary Building

Hughbanks alleges that the floors in the dietary building at MDSP are

"completely filthy and unsanitary." Docket 20 at 32. Hughbanks brings this

claim against Fluke, Reyes, and Schieffer.[11] *Id.* at 32–34. He seeks to recover

damages because he has been required to eat in an unsanitary environment.

*Id.* at 34–35. Hughbanks has submitted no evidence to support his allegations

of unsanitary conditions. It is undisputed that the floors are swept and mopped

after meal service using a commercial cleaning product in accordance with

required health codes. Docket 174 ¶¶ 15–17; Docket 182 ¶ 221. The annual

Department of Health inspections of the dietary building have not revealed

---

[11] Hughbanks also brings this claim against Summit Food Service, Anderson, and Halverson, *see* Docket 20 at 35, which will be addressed when the court considers these defendants' motion for summary judgment.

unsanitary conditions. Docket 182 ¶ 207; Docket 172-76 at 1; Docket 172-78 at 1; Docket 172-77 at 1; Docket 172-79 at 1. The undisputed facts do not constitute an extreme deprivation that posed a substantial risk of serious physical harm to Hughbanks.

Further, Hughbanks does not allege that he suffered any physical harm or injury due to the allegedly filthy and unsanitary floors in the dietary building. Docket 20 at 32–35. The Prison Litigation Reform Act (PLRA) mandates that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury[.]" 42 U.S.C. § 1997e(e). The Eighth Circuit interprets § 1997e(e) "as limiting recovery for mental or emotional injury in all federal actions brought by prisoners." *McAdoo v. Martin*, 899 F.3d 521, 525 (8th Cir. 2018) (quoting *Royal v. Kautzky*, 375 F.3d 720, 723 (8th Cir. 2004)). The PLRA "require[s] more than a de minimis physical injury." *Id.* (citing *Smith v. Moody*, 175 F.3d 1025, 1025 (8th Cir. 1999) (unpublished per curiam) (citing *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997)). Because Hughbanks has not alleged any physical injury due to the allegedly filthy and unsanitary floors, § 1997e(e) bars his claim for damages. For these reasons, defendants are entitled to summary judgment on this claim.

### C.   Air Handling System

Hughbanks alleges that the air handling system in the dietary building at MDSP is "inadequate and jeopardizes the health and well being of all who eat in

there and work in the[re]." Docket 20 at 35. Hughbanks brings this claim against Schieffer and Fluke. *Id.* at 35–37. Defendants contend that Hughbanks has not exhausted his administrative remedies regarding this claim. Docket 172 at 12–13. On June 8, 2020, Hughbanks submitted an IRR concerning the air handling system in the dietary building. Docket 172-92 at 5 (stating that "the air handling system in the Dietary Building is inadequate and jeopardizes the health and well being of all who eat in there/work in there."). An Informal Resolution Response was provided to Hughbanks on June 12, 2020. *Id.* at 4. Hughbanks submitted a Request for Administrative Remedy asserting that the air handling system is blowing COVID-19 around the dietary building and that he is not social distancing with other inmates. *Id.* at 2–3. The Request for Administrative Remedy was rejected because the applicable policy provides that a Request for Administrative Remedy may address only one grievance. *Id.* at 1. Hughbanks did not resubmit an Administrative Remedy Request after his initial request was rejected. Docket 173 ¶ 21. Because Hughbanks's Administrative Remedy Request was rejected, Hughbanks did not fully exhaust his administrative remedies concerning the air handling system. *Id.* ¶ 22. Defendants are entitled to summary judgment on Hughbanks's claim that the air handling system in the dietary building is inadequate.

### D.   Utensils[12] and Tables

Hughbanks alleges that the tables and utensils used in the dietary building are "unsanitary" and "incapable of being truly cleaned and sanitary." Docket 20 at 38, 40. Hughbanks brings this claim against Fluke, Schieffer, and Reyes. *Id.* Defendants contend that Hughbanks has not exhausted his administrative remedies regarding his claim alleging unsanitary utensils. Docket 172 at 15. On August 16, 2021, Hughbanks submitted an IRR claiming that utensils in the dietary building are "rarely clean due to not soaking them in a solution of detergent and water[.]" Docket 172-96 at 2. Hughbanks received a response to the IRR that stated, "Per Summit: This issue is currently being addressed by Summit Staff." *Id.* at 1. After receiving the response, Hughbanks did not file an Administrative Remedy Request. Docket 182 ¶ 67. *See also* Docket 20 at 95. Because it is undisputed that Hughbanks did not exhaust his administrative remedies regarding his unsanitary utensil claim, defendants are entitled to summary judgment on this claim.

Hughbanks alleges that the tables in the dietary building are unsanitary and incapable of being truly cleaned and sanitary. Docket 20 at 38. As a result, Hughbanks alleges that "inmates [have] contract[ed] illnesses." *Id.* But Hughbanks cannot bring a § 1983 on behalf of other inmates. *Martin*, 780 F.2d

---

[12] Hughbanks alleges that Summit Food Service, Anderson, and Halverson "are responsible for not having enough utensils, not having a soak solution set-up, and allowing racks to be overloaded." Docket 20 at 40. This claim will be addressed when the court considers these defendants' motion for summary judgment.

at 1337. Hughbanks does not allege that he has contracted an illness or sustained any physical injury due to allegedly unsanitary tables in the dietary building. *See* Docket 20 at 38–40. Section 1997e(e) of the PLRA bars his claim for damages. Defendants are also entitled to summary judgment on this claim because Hughbanks has not submitted any evidence to support his allegations. On the basis of the record before the court, it is undisputed that all tables are cleaned and wiped down after every meal. Docket 182 ¶ 239.

### E.    Laundry

Hughbanks alleges that because of a DOC policy that was implemented in 2021 that allows inmate laundry workers to refuse to do an inmate's laundry if the inmate puts sheets or blankets inside their mesh laundry bags, on one occasion, April 27, 2021, his clothing was not washed because he hid a sweatshirt inside a pillowcase, which can be laundered in an inmate's mesh laundry bag. Docket 20 at 42. Hughbanks brings these claims against Henry, Voigt, Schieffer, and Fluke. *Id.* at 41–44. Defendants contend that Hughbanks has not exhausted his administrative remedies regarding this claim. Docket 172 at 14.

Hughbanks submitted a grievance, dated April 27, 2021, concerning his laundry being returned unwashed. Docket 182 ¶ 65; Docket 172-94 at 5. An IRR was returned to Hughbanks stating that his laundry was returned unwashed because there were sheets/blankets inside his laundry bag. Docket 182 ¶ 65; Docket 172-94 at 4. Hughbanks filed a Request for Administrative Remedy stating that he had placed one sweatshirt inside a pair of pants and

another sweatshirt inside a pillowcase to hide them "so thieves on the unit and at laundry could not see them." Docket 172-94 at 2. Hughbanks also requested that the DOC provide him "with laundry detergent and fabric softener at states [sic] expense." *Id.* at 3. Hughbanks's Request for Administrative Remedy was rejected, and he was instructed to submit a project application. *Id.* at 1. It is undisputed that Hughbanks did not resubmit another Administrative Remedy Request after his initial request was rejected. Docket 182 ¶ 65. Further, there is no evidence that Hughbanks submitted a project application. Because Hughbanks has failed to fully exhaust his administrative remedies regarding his claim that his laundry was returned unwashed, defendants are entitled to summary judgment on this claim.

Voigt is also entitled to summary judgment on this claim because the claim is moot. Only Hughbanks's conditions of confinement claims against Voigt in her official capacity for injunctive relief survived screening. Docket 11 at 40. Because Hughbanks is no longer incarcerated, his claims against Voigt are moot.

### F.   Paper Towels

Hughbanks alleges that because paper towels are not available in the restrooms at MDSP, he cannot adequately wash his hands by using a paper towel to turn off the faucet. Docket 20 at 44–45. Hughbanks contends that the failure to make paper towels available demonstrates, in part, "inept handling of the coronavirus pandemic . . . [that] ha[s] caused great stress, worry, anxiety,

and emotional trauma from loss of friends and fear of getting the virus." *Id.* at 45–46. Hughbanks brings this claim against Schieffer and Fluke. *Id.* at 44–46.

Although paper towels are not available, it is undisputed that each inmate is issued two hand towels to dry their hands, and the hand towels may be washed every day. Docket 182 ¶¶ 262–263. These undisputed facts are not an extreme deprivation sufficient to give rise to an Eighth Amendment claim. Further, because Hughbanks does not allege any physical injury, § 1997e(e) bars his claim for damages. Defendants are entitled to summary judgment on this claim.

### G.    Nutrition

Hughbanks alleges that Summit Food Services often runs out of certain food items and makes substitutions of lesser quantity and nutritional value. Docket 20 at 73–77. He alleges that prison staff refused to address this issue and informed him that the substitutions meet nutritional requirements. *Id.* Because of the alleged lack of nutritious meals, Hughbanks alleges compromise of his immune system and deterioration and degeneration of his bones and joints. *Id.* at 75. Hughbanks brings these claims against Fluke and Reisch.[13]

Inmates have a right to adequate nutrition, and the failure to provide adequate nutrition may constitute deliberate indifference in violation of the Eighth Amendment. *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992). An

---

[13] Hughbanks also brings this claim against Summit Food Service, Halverson, and Anderson, *see* Docket 20 at 76–77, which will be addressed when the court considers these defendants' motion for summary judgment.

inmate alleging an inadequate diet under the Eighth Amendment must demonstrate that he lost significant weight or suffered adverse physical effects from lack of nutrition or was denied a nutritionally or calorically adequate diet. *Id.*; *see also Ingrassia v. Schafer*, 825 F.3d 891, 899 (8th Cir. 2016); *Davis v. Missouri*, 389 F. App'x. 579, 579 (8th Cir. 2010) (per curiam) (collecting cases). It is undisputed that dietary allowances are reviewed and documented annually by a qualified nutritionist or registered dietician to insure meals meet dietary guidelines. Docket 182 ¶ 275. At times, food services run out of food, but substitutions are made. *Id.* ¶ 270. The substitutions meet daily nutritional needs. *Id.* ¶¶ 271, 273–275. It is also undisputed that Hughbanks has not lost significant weight or suffered any adverse physical effects due to lack of nutrition. *Id.* ¶¶ 277, 279. Thus, defendants are entitled to summary judgment on this claim.

### H.    Overcrowding and Understaffing

Hughbanks claims that MDSP is overcrowded and understaffed, resulting in dangerous conditions. Docket 20 at 86–89. The court construed this claim to be a condition of confinement claim. Docket 11 at 29. Hughbanks seeks only injunctive relief for this claim. Docket 20 at 89. Thus, this claim is moot, and defendants are entitled to summary judgment on this claim.

## VII.   First Amendment Claim – Inmate Correspondence Policy

### A.    Legal Standard

Inmates have a First Amendment right to receive mail. *Weiler v. Purkett*, 137 F.3d 1047, 1050 (8th Cir. 1998). But that "right may be limited by prison

regulations that are reasonably related to legitimate penological interests." *Id.*
In *Turner v. Safley*, the Supreme Court held that prison rules and restrictions
on First Amendment rights are constitutional only "if [they are] reasonably
related to legitimate penological interests." 482 U.S. 78, 89 (1987). The *Turner*
Court provided four factors to determine whether a prison rule withstands
scrutiny:

> (1) whether there is a valid rational connection between the
> regulation and the legitimate government interest it purports to
> further; (2) whether the inmate has an alternative means of
> exercising his constitutional right; (3) the impact that
> accommodation of the inmate's right would have upon others,
> including inmates as well as non-inmates; and (4) the absence of a
> ready alternative to the regulation.

*Thongvanh v. Thalacker*, 17 F.3d 256, 259 (8th Cir. 1994). Courts must give
"considerable deference to the determinations of prison administrators who, in
the interests of security, regulate the relations between prisoners and the
outside world." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) (citation
omitted). Deference is accorded to prison administrators because the realities
of running a penal institution are complex, and courts are ill-equipped to deal
with problems of prison administration. *Jones v. N.C. Prisoners' Lab. Union,
Inc.*, 433 U.S. 119, 136 (1977).

### B.    Facially Unconstitutional

Hughbanks alleges that the DOC inmate correspondence policy is facially
unconstitutional. Docket 20 at 47–49. He brings this claim against Reisch,
Fluke, and Schieffer. *Id.* According to Hughbanks, the policy bans envelopes
that are not white, that use envelope sealers or tape, and that have return

address labels. *Id.* at 47. Unused postage stamps, unused envelopes, commercial greeting cards, blank paper, postcards, and colored paper are also banned. *Id.* He alleges that incoming mail from the DOC is not considered privileged legal correspondence unless it is marked as such, and as a result, this mail is opened before it reaches him. *Id.* at 48. He also contends that outgoing mail addressed to the NAACP, the Bureau of Indian Affairs, and other organizations is not considered privileged, legal correspondence. *Id.*

It is not necessary for the court to apply the *Turner* factors in this case to evaluate whether the mail policy prohibiting colored envelopes, adhesives, post cards, and certain drawings on envelopes is constitutional. Defendants are entitled to qualified immunity on Hughbanks's claim for damages because it cannot fairly be said that defendants violated Hughbanks's clearly established constitutional right. A right is "clearly established" if the law was sufficiently clear that every reasonable officer would understand that his conduct violated that right. *District of Columbia v. Wesby*, 538 U.S. 48, 63 (2018). Hughbanks has not provided any authority to support his allegation that a prison mail policy prohibiting colored envelopes, adhesives, or other physical attributes that are banned to prevent contraband from entering the prison is unconstitutional. In fact, this District has previously held that prison officials are entitled to qualified immunity on a claim for rejecting correspondence under the DOC policy banning adhesive labels because the plaintiff made no showing that the prison officials had violated a clearly established right. *Bell v. Young*, No. 4:21-CV-04134-LLP, 2022 WL 4482855, at *17 (D.S.D. Sept. 27,

2022). Further, a number of courts have held that return of mail based on physical deficiencies rather than content does not violate a prisoner's First Amendment right to receive mail. *Whitington v. Moschetti*, 423 F. App'x 767, 772 (10th Cir. 2011) ("[W]e have held that an inmate who challenged a policy of returning correspondence with stickers to the sender had not shown the violation of any protected right."); *Matthews v. Washington Dep't of Corrs.*, 2016 WL 1426302, at *4 (W.D. Wash. Feb. 11, 2016) (stating that return of mail based on a deficiency apparent on the envelope does not implicate the First Amendment); *Odom v. Pheral*, 2013 WL 1703868, at *8, (W.D. Ky. Apr. 19. 2013) (holding that allegation that a package was rejected because it was covered in tape fails to state a constitutional violation); *Sikorski v. Whorton*, 631 F. Supp. 2d 1327, 1348 (D. Nev. 2009); *Jeffries v. Snake River Corrs.*, 2008 WL 3200802, at *4 (D. Or. Aug. 4, 2008), *aff'd*, 362 F. App'x 587 (9th Cir. 2010) (prohibiting incoming mail containing stickers or certain adhesives does not violate prisoner's First Amendment right to receive mail).

"Prison officials may open and read non-privileged legal mail." *Chance v. Johnson*, 2019 U.S. Dist. LEXIS 194788, at *3 (E.D. Ark. Oct. 8, 2019) (citing *Bumgarner v. Bloodworth*, 768 F.2d 297, 301 (8th Cir. 1985)). "The Supreme Court implicitly approved the opening of nonprivileged mail to inspect for contraband[.]" *Mosby v. Mabry*, 697 F.2d 213, at 215 (8th Cir. 1982) (citing *Wolff v. McDonnell*, 418 U.S. 539 (1974)). *See also Gardner v. Howard*, 109 F.3d 427, 431 (8th Cir. 1997). The Eighth Circuit defines "[p]rivileged prisoner mail" as "mail to or from an inmate's attorney and identified as such[.]" *Beaulieu v.*

64

*Ludeman*, 690 F.3d 1017, 1037 (8th Cir. 2012) (quoting *Gardner*, 109 F.3d at 430). Hughbanks alleges, but has not provided any evidence, that he has sent correspondence to any organization that is not considered privileged legal correspondence that meets the Eighth Circuit's definition of "privileged prisoner mail." *See* Docket 20 at 48. Further, it is undisputed that correspondence from Special Assistant Attorney General Schlimgen sent from the DOC to an inmate would be opened only if the envelope is not marked as legal or does not contain her name. Docket 179 ¶ 12. Defendants are entitled to summary judgment on this claim.

### C.    Unconstitutional As Applied

Hughbanks alleges that the inmate correspondence policy is unconstitutional as applied. Docket 20 at 49–51. He brings this claim against Fluke and Warembourg. *Id.* Hughbanks claims that correspondence printed on cardstock, including business cards from Bethel University and correspondence from Southeast Technical College, have been rejected and that there is no written policy banning cardstock or business cards. *Id.* at 50. He also alleges that folders from Bethel University have been rejected although there is no policy against folders. *Id.* Finally, he claims that the prison provides folders to inmates for several purposes and permits visiting politicians, religious leaders, and others to hand out business cards. *Id.* Hughbanks alleges that this inconsistent application of the inmate correspondence policy violates his right to receive correspondence. *Id.* Defendants do not address these allegations in their memorandum in support of their motion for summary

judgment. Docket 172 at 64–71.[14] Thus, defendants' motion for summary judgment on this claim is denied.

## VIII.  Access-to-the-Courts Claims

### A.    Legal Standard

"The Constitution guarantees prisoners a right to access the courts." *White v. Kautzky*, 494 F.3d 677, 679 (8th Cir. 2007). To succeed on a claim for denial of access to the courts, a plaintiff must show that he suffered actual injury as a result of the defendants' actions. *Lewis v. Casey*, 518 U.S. 343, 349 (1996). In order to satisfy the actual injury requirement, a plaintiff must "demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded." *Johnson v. Missouri*, 142 F.3d 1087, 1089 (8th Cir. 1998) (quoting *Lewis*, 518 U.S. at 353).

### B.    Printing Charges

Hughbanks alleges that MDSP's policy charging inmates $0.05 per page for photocopies and $0.05 per page to print legal documents is intended to frustrate "inmates from pursuing legitimate legal action[.]" Docket 20 at 64. Because Hughbanks was earning only $0.40 per hour, he contends that he was forced to choose "between using the computers and being charged what he

---

[14] One of the inmate correspondence policies defendants submitted in support of their motion for summary judgment provides "General correspondence must be on plain white copy/typing paper or lined white paper (legal paper), unless received directly from . . . [a] religious organization or educational institution." Docket at 172-89 at 5. Because defendants did not address these allegations, it is not clear whether this policy was in effect when Hughbanks's correspondence from Bethel University and Southeast Technical College was allegedly rejected, and, if so, why.

could not afford, or not file claims. As a result, some claims have been forfeited." *Id.* at 63. Hughbanks brings this claim against Reisch, Fluke, and Schieffer. *Id.* at 62–65. Although Hughbanks alleges "some claims have been forfeited" because of printing and copying charges, Hughbanks has not submitted any evidence that printing and copying charges have prevented him from filing any meritorious action challenging his sentence or conditions of confinement. Accordingly, the record is devoid of any evidence supporting an essential element of Hughbanks's First Amendment access-to-the-court claim challenging printing and copying charges. Thus, defendants are entitled to summary judgment on this claim.

### C.   Absences

Hughbanks alleges that he missed work, academic programming, and vocational programming because he was scheduled for a legal typing session in the computer lab and that his absences were unexcused. Docket 20 at 66. Hughbanks requested permission to purchase a laptop computer so that he can do legal typing without disrupting work and programming schedules. *Id.* 67. Hughbanks's request was denied. *Id.* Hughbanks contends that his right of access to courts has been violated and brings this claim against Fluke, Schieffer, Voigt, and Reisch. *Id.* at 66–69.

Defendants argue that Hughbanks failed to exhaust his administrative remedies regarding these claims. Docket 172 at 15–16. On July 22, 2021, Hughbanks submitted an IRR regarding being scheduled for legal typing when he is scheduled to work. Docket 172-95 at 2. An informal resolution response

was provided to Hughbanks. *Id.* at 1. Hughbanks did not file an administrative remedy request following receipt of the informal resolution response. Docket 182 ¶ 66.

On August 16, 2021, Hughbanks filed an IRR requesting a laptop computer because he had been denied legal typing and legal materials. Docket 172-97 at 4. An informal resolution response was provided to Hughbanks advising that courts accept handwritten documents. *Id.* at 3. Hughbanks filed a request for administrative remedy on August 27, 2021, asserting that considering legal typing as an unexcused absence denied him access to the courts and requesting a laptop computer and external hard drive. *Id.* at 2. The administrative remedy request was rejected because it addressed multiple grievances. *Id.* at 1. Because Hughbanks did not resubmit an administrative remedy request after the rejection, he did not exhaust his administrative remedies. Docket 182 ¶ 68. Defendants are entitled to summary judgment on this claim because it is undisputed that Hughbanks failed to fully exhaust his administrative remedies.

Even if Hughbanks had exhausted his administrative remedies, defendants would be entitled to summary judgment on this claim. Prisoners do not have a constitutional right to possess or use typewriters or computers. *See, e.g.*, *Am. Inmate Paralegal Assoc. v. Cline*, 859 F.2d 59, 61 (8th Cir. 1988) (per curiam) ("Prison inmates have no constitutional right of access to a typewriter[.]"); *Roberts v. Cohn*, 63 F. Supp. 2d 921, 924 (N.D. Ind. 1999) ("It is well established that prison inmates do not have a constitutional right to use or

possess typewriters and word processors." (citations omitted)). Hughbanks is not legally required to type his submissions to prosecute this case or any other claim challenging his conditions of confinement or attacking his sentence. Hughbanks's First Amendment right of access to the courts is "satisfied by providing basic materials, such as ink pens and paper, for the preparation of legal materials." *Roberts*, 63 F. Supp. 2d at 924–25 (citations omitted).

Although Hughbanks alleges that his complaint was filed more than a year after he intended to file it and that he lost the ability to pursue redress for some claims (Docket 20 at 66), Hughbanks has not submitted any evidence in support of this allegation. Similarly, he did not submit any evidence to support his allegation that he was unable to "appeal [state] habeas corpus action or file a federal one."[15] *Id.*

### D.   Overdrawn Balance Policy

Hughbanks claims that prison policy only allows prisoner accounts to be overdrawn by two dollars, preventing him from making photocopies necessary to pursue claims. Docket 20 at 69. Hughbanks does not seek monetary damages for this claim. *Id.* at 69–70. He seeks only declaratory and injunctive relief. *Id.* Because Hughbanks's claims for declaratory and injunctive relief are moot, defendants are entitled to summary judgment on this claim.

---

[15] This allegation is suspect. Hughbanks filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. *Hughbanks v. Warden Brent Fluke*, 4:22-CV-04154-KES (D.S.D.). Magistrate Judge Duffy's report and recommendation discusses the three state habeas petitions Hughbanks filed. *Id.*, Docket 20 at 7–10.

### E.    Tablet Use

Hughbanks alleges that the tablets that are provided to inmates to conduct legal research have issues that present inmates from performing legal research. Docket 20 at 70. Specifically, he claims that the network is often down, that the tablets operate slowly, and that the tablets do not provide access to cases from other states or South Dakota circuit courts. *Id.* Hughbanks seeks only injunctive relief on this claim, *id.* at 71, which is now moot. Defendants are entitled to summary judgment on this claim.

### F.    Account Statements for PLRA Requirements

Hughbanks claims that charging inmates fifty cents for each monthly account report violates his First Amendment right to access the courts. Docket 20 at 71–72. He asserts that the DOC's policy of charging fifty cents for each monthly account report "can have only one goal, to further discourage [him] and other inmates from pursuing actions in court[.]" *Id.* at 72. There is a rational basis for charging fifty cents for each monthly account report. *See* Docket 182 ¶¶ 373–380. The policy provides that indigent inmates requesting a statement for PLRA filing may have the costs added to their credit obligations, and Hughbanks was permitted to take out a loan for his PLRA statements. *Id.* ¶¶ 374, 380. Defendants argue that Hughbanks has failed to show any actual injury or that the policy impeded his access to the courts in any way. Docket 172 at 78–79. To prove an actual injury, Hughbanks must "demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded." *Casey*, 518 U.S. at 353. Hughbanks does not allege that the DOC policy of charging

70

fifty cents for each monthly account report has prevented him from filing any meritorious action challenging his sentence or conditions of confinement. Accordingly, the record is devoid of any evidence supporting an essential element of Hughbanks's First Amendment access to the court claims. Thus, defendants are entitled to summary judgment on this claim.

## IX.    Sex Offender Management Program Policy Claims

Hughbanks claims that the Sex Offender Management Program is unconstitutional both on its face and as applied. Docket 20 at 81–83. He challenges the use of polygraph tests to determine if those on suspended sentence supervision can remain in the community on supervised release. *Id.* He contends that the DOC, Carlson, and the Parole Board give great weight to the opinions of polygraph examiners without a fair warning as to what constitutes a "policy driven response" or "standardized polygraph treatment responses." *Id.* He alleges that he and other individuals are required to disclose potentially incriminating matters, unrelated to their convictions, that could result in an automatic loss of liberty. *Id.* The refusal to make such disclosures, according to Hughbanks, can result in termination of treatment, which is a violation of the terms and conditions of supervised release. *Id.* Hughbanks claims that prison staff improperly administered screenings and assessments designed to evaluate his risk of recidivism. *Id.* at 89–90. Hughbanks brings these claims against Reisch, Carlson, Stoebner, Gilchrist, Fluke, and individual members of the South Dakota Board of Pardons and Paroles. *Id.* at 84–86, 89–93.

Because Hughbanks did not respond to defendants' motion for summary judgment, the record contains no evidence to support his allegations regarding the SOMP or the revocation of his parole. On the basis of Defendants' Statement of Undisputed Material Facts, which are deemed admitted, defendants are entitled to judgment as a matter of law on Hughbanks's SOMP policy claims.

### A.   Fourteenth Amendment Right to Due Process

#### 1.   Parole Board Members are Entitled to Absolute Immunity

When the court screened Hughbanks's complaint, the court dismissed Hughbanks's claims against the South Dakota Board of Pardons and Paroles because the Parole Board is arm of the state of South Dakota and not subject to suit under § 1983. Docket 11 at 24. In his amended complaint, Hughbanks added as defendants Parole Board members.[16] Docket 20 at 7–9. The Eighth Circuit has held that parole board members are absolutely immune from suit for considering and deciding parole questions, even if they make an unconstitutional or unlawful decision. *Patterson v. Von* Riesen, 999 F.2d 1235, 1239 (8th Cir. 1993). The Parole Board members are absolutely immune from suit arising out of the revocation of Hughbanks's parole.

#### 2.   *Heck* Favorable-Termination Rule

Hughbanks's claims stem from his allegations that defendants required him to self-incriminate to participate in SOMP, provided incorrect instructions

---

[16] Gordon Swanson, Kenneth Albers, Mark Smith, Myron Rau, Paige Wilbur Bock, Dave Nelson, Kevin Krull, Anne Hajek, Ed Ligtenberg, and Gregg Gass. Docket 20 at 7–9.

for sex offender assessments to generate results would harm his parole eligibility, and lied about some of his responses in assessments. Docket 20 at 81–83, 89–91. A § 1983 claim for damages arising out of a parole revocation and extended incarceration is not cognizable unless the underlying sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by the issuance of a writ of habeas corpus. *Newmy v. Johnson*, 758 F.3d 1008, 1011–12 (8th Cir. 2014) (holding that § 1983 action seeking damages for additional detention time due to an allegedly false parole officer's report is barred by *Heck*'s favorable termination rule). The South Dakota Supreme Court affirmed the revocation of Hughbanks's parole. Docket 182 ¶¶ 394, 395. Because no court or tribunal has reversed or called into question any aspect of Hughbanks's sentence, his § 1983 claim for damages arising out of SOMP policies is not cognizable. Defendants are entitled to summary judgment on this claim.

### B.   Fifth Amendment Right to be Free from Self-Incrimination

Hughbanks's claim that the SOMP policies violate his Fifth Amendment right to be free from self-incrimination survived screening against Clark[17] and Carlson in their official capacities for injunctive relief only. Docket 11 at 41; *see also id.* at 38 (recognizing that money damages are not available for any judicially-created expansion of the Fifth Amendment clause). Hughbanks's

---

[17] Clark is no longer the Interim Secretary of Corrections. In accordance with Federal Rule of Civil Procedure 25(d), Kellie Wasko, the current Secretary of Corrections, has been substituted for Clark on the official capacity claims.

claims for injunctive relief are moot, and defendants are entitled to summary judgment on this claim.

Thus, it is ORDERED:

1.    That Hughbanks's claims against Unknown Correctional Health Services Employees, CHS Jane Doe, and SOMP John Doe are dismissed without prejudice.

2.    That defendants' motion for summary judgment (Docket 171) is granted in part and denied in part. Hughbanks's claims against these defendants are dismissed with the exception of his claim against Fluke and Warembourg in their individual capacities for damages arising out of the alleged rejection of correspondence from Bethel University and Southeast Technical College. Hughbanks's official capacity claims against Fluke and Warembourg are dismissed as moot.

Dated March 28, 2024.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE