UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| KEVIN LEE HUGHBANKS, | 4:21-CV-04167-KES |
| Plaintiff, | |
| vs. | |
| BRENT FLUKE, Warden, Mike Durfee State Prison, in his individual capacity[1]; CHARISSA WAREMBOURG, Mailroom Officer, Mike Durfee State Prison, in her individual capacity; SUMMIT FOOD SERVICE, LLC, Mike Durfee State Prison, in its individual and official capacity; KIM HALVERSON, Summit Food Service, LLC., Director at Mike Durfee State Prison, in her individual and official capacity; and JARROD ANDERSON, Former Summit Food Service, LLC., Director at Mike Durfee State Prison, in his individual capacity, | ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |
| Defendants. | |

Plaintiff, Kevin Lee Hughbanks, filed a pro se lawsuit under 42 U.S.C.

§ 1983. Dockets 5, 20. At the time Hughbanks commenced his lawsuit, he was

incarcerated at the Mike Durfee State Prison (MDSP), but he has since been

---

[1] Fluke is no longer warden of the Mike Durfee State Prison. Under Federal Rule of Civil Procedure 25(d), "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party." Hughbanks's remaining official capacity claims against Fluke and Warembourg were dismissed as moot because Hughbanks has been released from prison. Docket 211 at 74. Because all official capacity claims against Fluke have been dismissed, substitution of Fluke's successor is not necessary.

released. Dockets 1, 151, 194, 195. Defendants, who are employed by the South Dakota Department of Corrections (collectively referred to as DOC), moved for summary judgment. Docket 171. This court granted the DOC's motion for summary judgment in part and denied it in part, specifically as to Hughbanks's individual capacity First Amendment claim for rejection of correspondence against former MDSP Warden Brent Fluke and Corporal Charissa Warembourg. Docket 211 at 74. Hughbanks's Eighth Amendment conditions of conferment claims against Summit Food Service (Summit), Summit Director Kim Halverson, and Former Summit Director Jarrod Anderson (collectively "Summit defendants") also are pending. *Id.* at 53 n.10, 54 n.11, 57 n.12, 60 n.13.

Now, Summit defendants move for summary judgment on the Eighth Amendment claims against them. Dockets 202, 204. Fluke and Warembourg move for summary judgment on the First Amendment claim against them. Docket 213.

## FACTUAL BACKGROUND

Because defendants move for summary judgment, the court recites the facts in the light most favorable to Hughbanks. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). But Hughbanks did not respond to defendants' statements of undisputed material facts. Dockets 205, 215. Local Civil Rule 56.1(D) provides, "All material facts set forth in the movant's statement of material facts will be deemed to be admitted unless controverted by the opposing party's response to the moving party's statement

2

of material facts." D.S.D. Civ. LR 56.1(D). The court deems all the statements in defendants' statements of undisputed material facts to be admitted. *Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001) (stating that a plaintiff's pro se status does not excuse him from responding to a motion for summary judgment "with specific factual support for his claims to avoid summary judgment[]") (citing Fed. R. Civ. P. 56(e)).

## I.     Conditions of Confinement

### A.     Sanitation

Hughbanks alleges that the dietary building has infestations of flies.[2] Docket 20 at 29–32. The doors in the dietary building have air flow barriers and curtains to prevent flies from entering the building; the building also has fly strips. Docket 174 ¶ 13; Docket 182 ¶ 204.[3] Summit also had electronic fly traps. Docket 182 ¶ 206.

Hughbanks also alleges that the floors in the dietary building are filthy and unsanitary. Docket 20 at 32–33. The dining hall floors are concrete with a protective layer on top; the floors appear worn overtime but are swept and

---

[2] Hughbanks's allegations in his amended complaint are insufficient to defeat a motion for summary judgment. *See Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007); *Henthorn v. Capitol Communs., Inc.*, 359 F.3d 1021, 1026 (8th Cir. 2004). The court has included Hughbanks's allegations to provide context for the undisputed facts supported by record evidence.

[3] In their Brief in Support of Motion for Summary Judgment of Defendants Summit Food Service, LLC, Kim Halverson, and Jarrod Anderson, Docket 206, Summit defendants incorporate by reference all statements of facts, affidavits, reports, arguments, and legal authorities alleged by defendants employed by the DOC in their first motion for summary judgment. *Id.* at 1. The material facts in the DOC defendants' first motion for summary judgment were deemed admitted because Hughbanks did not respond to or controvert the alleged facts. *See* Docket 211 at 6.

mopped after every meal service and are cleaned with a commercial cleaning product that meets required health codes. Docket 174 ¶¶ 15, 16, 17; Docket 182 ¶¶ 217, 221.

Hughbanks alleges that eating utensils and tables are unsanitary and incapable of being cleaned and sanitary. Docket 20 at 38, 40. Tables are cleaned in between groups of inmates eating at the tables. Docket 182 ¶ 238. Tables and eating utensils are cleaned after every meal. *Id.* ¶ 239. Eating utensils are run through the dishwasher, which is routinely inspected to confirm the washing temperature is appropriate. *Id.* ¶ 240.

Summit contracted with the DOC to provide food services at MDSP and other correctional facilities. Docket 205 ¶ 3. The DOC was the final policymaker for operations of Summit at the MDSP. *Id.* ¶ 12; Docket 208-1 at 5. Policies governing kitchen and food service sanitation were established by contract and otherwise subject to final approval by the DOC. Docket 205 ¶ 5. The DOC also had final approval and oversight of policies governing sanitation, including where food was served and consumed and sanitation of food utensils, trays, tables, floors, service areas, and storage areas. *Id.* ¶¶ 6–7; Docket 208-1 at 1–2. All employees who worked with preparing and serving food and cleaning the kitchen and dining areas received training to comply with DOC standards. Docket 205 ¶ 9. The training was provided with the DOC's approval and oversight. *Id.* The kitchen at the MDSP is inspected annually by the South Dakota Department of Health and received passing scores from 2020 through 2022. *Id.* ¶ 17; Docket 208-1 at 141–46. Summit met all requirements of its

contract with the DOC. Docket 205 ¶ 11. Summit's contract with the DOC ended on June 30, 2023. *Id.* ¶ 3. *But see* Docket 208-1 at 2 (stating that Summit has not been the food service contractor since September 30, 2022); Docket 206 at 3 (stating that Summit is no longer the food service provider as of October 1, 2023).

### B.   Nutrition

Hughbanks alleges that on multiple occasions Summit defendants ran out of food and made substitutions of lower quality food with lower nutritional value. Docket 20 at 73. Hughbanks claims that alleged lack of nutritious meals has compromised his immune system and caused deterioration and degeneration of his bones and joints. *Id.* at 75. But prison health records show that Hughbanks was well nourished. Docket 205 ¶ 20 (citing Docket 182 ¶¶ 277–300).

Summit contracted with the DOC to provide food services to DOC correctional facilities. *Id.* ¶ 3. Summit employed Licensed Dietician Jessica Waldner to review menus and ensure compliance with the DOC contract. *Id.* ¶ 8; Docket 208-1 at 2. Menus were reviewed at least twice annually to ensure variety in the meals, and food products that did not meet Summit's standards were removed from future menus. Docket 205 ¶ 8; Docket 208-1 at 2. The dietary guidelines for protein, minerals, vitamins, and fats that Summit served to inmates at the MDSP were determined by the DOC contract. Docket 205 ¶ 9. All diets served at the MDSP complied with the National Institute of Health's (NIH) Dietary Recommended Intakes and Recommended Dietary Allowances

Guide. *Id.*; Docket 208-1 at 2. Diets contained a weekly average of 2,700 calories and included 120 grams of protein. Docket 205 ¶ 9; Docket 208-1 at 3–4. When meal and menu substitutions were required due to unavailability and inadequate supply levels of certain food products, substitutions were subject to final approval by the DOC. Docket 205 ¶¶ 10, 19; Docket 208-1 at 4–5. The DOC found no evidence that inmates were being provided nutritionally inadequate meals. Docket 205 ¶ 19 (citing Docket 182 ¶¶ 266–276).

In 2017, the DOC hired a private consultant to perform an independent review of its prison food service program. *Id.* ¶ 13; Docket 208-1 at 111–12, 127. While the review found that the menu items at the MDSP were high in sodium content and recommended a sodium reduction, it found that the food service program and food quality were good overall. Docket 205 ¶ 14; Docket 208-1 at 111–12, 118. In 2019, the DOC made arrangements for another independent evaluation of the food services program. Docket 205 ¶ 15; Docket 208-1 at 112. The second report indicated that all or most of the DOC facilities are National Commission on Correctional Health Care accredited, which standards require a nutritionally adequate diet for the main population. Docket 205 ¶ 15; Docket 208-1 at 112, 135–36.

## II.   Inmate Correspondence Policy

The DOC has an inmate correspondence policy. Docket 172-89. Hughbanks alleges that Fluke instructed mailroom staff to reject outright incoming correspondence on cardstock, despite there not being a prison policy that prohibited these materials. Docket 20 at 50. Hughbanks alleges that he

was mailed a business card and folder from Bethel University and correspondence from Southeast Technical College (STC), which he did not receive. *Id.*

On June 15, 2021, Hughbanks filed an informal resolution request stating that on the previous day he received a mailroom correspondence rejection notice informing him that mail from Bethel University was rejected because it contained contraband: a folder and a business card. Docket 214-1 at 3. Prison staff issued an informal resolution response that informed Hughbanks of the DOC's inmate correspondence policy, which prohibited greeting cards, postcards, and other mailings, "unless received directly from an attorney/privileged source, religious organization or educational institution. Post cards and commercial or personal greeting cards are not permitted." *Id.* at 2. The warden issued an administrative remedy response that informed Hughbanks that "[t]he MDSP mailroom has been directed to view business cards as postcards or greeting cards[,]" which are forbidden under DOC policy. *Id.* at 1.

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or by showing that the nonmoving party has not presented evidence to support an

element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To avoid summary judgment, a plaintiff may not rely solely on the allegations in the complaint but must substantiate his allegations with sufficient probative evidence. *Wilson v. Miller*, 821 F.3d 963, 970 (8th Cir. 2016). In this case, Hughbanks's complaint and amended complaint are not verified. Docket 1 at 83; Docket 20 at 96–97. Hughbanks did not respond to defendants' motions for summary judgment. Simply put, Hughbanks has not submitted any affidavits, record materials, or other probative evidence supporting the allegations in his amended complaint. Thus, the court must grant defendants' motions for summary judgment if the motion, supporting materials, including the facts considered undisputed show that defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e)(3).

Prisoners who proceed pro se are entitled to the benefit of liberal construction at the pleading stage. *Quam v. Minnehaha Cnty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987). Nonetheless, the summary judgment standard set forth in Rule 56 of the Federal Rules of Civil Procedure remains applicable to prisoners proceeding pro se. *Id.* The district court is not required to "plumb the record in order to find a genuine issue of material fact." *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996). Courts must remain sensitive, however, "to the special problems faced by prisoners attempting to proceed pro se in vindicating their constitutional rights, and [the Eighth Circuit does] not approve summary dismissal of such pro se claims without regard for these

8

special problems." *Nickens v. White*, 622 F.2d 967, 971 (8th Cir. 1980). "[W]hen dealing with summary judgment procedures technical rigor is inappropriate where . . . uninformed prisoners are involved." *Ross v. Franzen*, 777 F.2d 1216, 1219 (7th Cir. 1985).

## II.   Summit Defendants' Motions for Summary Judgment

### A.   Exhaustion of Administrative Remedies

Summit defendants claim that Hughbanks failed to exhaust his administrative remedies. Docket 205 ¶ 18. The Prison Litigation Reform Act (PLRA) requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Dismissal is mandatory if an inmate has not fully exhausted his administrative remedies at the time he files his complaint. *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003).

The Supreme Court has held that exhaustion of administrative remedies requires prisoners to complete the administrative review process in accordance with the applicable procedural rules as defined by the prison's grievance process, not the PLRA. *Jones v. Brock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. NGO*, 548 U.S. 81, 88 (2006)). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, not the PLRA, that define the boundaries of proper exhaustion." *Id.* Courts look at the

institution's specific grievance policy to determine whether the grievance procedures apply to private contractors of the institution. *Id. See also Ellis v. Daniel*, 2023 WL 6536158, at *4 (W.D. Ark. June 21, 2023) *adopted by* 2023 WL 6123100 (W.D. Ark. Sept. 19, 2023).

Although it is unclear if the DOC's grievance policies apply to third parties that contract with the State, this court need not reach that issue because Summit defendants acted under the DOC's policies. Under DOC policy, administrative remedy requests may be made for concerns relating to "[p]olicies, procedures, rules, directives, or conditions of care and supervision that are within the authority of the DOC and adversely impact the offender personally." Docket 172-91 at 4. The Summit defendants claim that the DOC had final approval and oversight over all policies regarding sanitation of kitchen and food service areas and sanitation of utensils, trays, tables, floors, service areas, and storage areas. Docket 205 ¶¶ 5–7, 12. Summit met all requirements of the contract with the DOC, and the DOC made all final decisions regarding sanitation and food preparation requirements. *Id.* ¶¶ 9, 11–12. This court already determined that Hughbanks had not exhausted his administrative remedies for his conditions of confinement claims for flies in the dietary building and sanitation of utensils and tables. Docket 211 at 53–54, 57–58. Because all of the Summit defendants' actions were done in accordance with the policies set by the DOC, the Summit defendants are entitled to summary judgment on Hughbanks's Eighth Amendment conditions of confinement claims for flies in the dietary building and unsanitary utensils and

tables due to Hughbanks's failure to exhaust his administrative remedies. This court will separately analyze Hughbanks's Eighth Amendment claims regarding the floors in the dietary building and nutrition. *See infra* at 13–15, 17–18.

### B.   Claims for Declaratory and Injunctive Relief

Hughbanks's amended complaint seeks declaratory and injunctive relief on his claims against Summit defendants. *See* Docket 20 at 31, 34, 39, 41, 76. Hughbanks moved to dismiss the claims seeking injunctive against Summit defendants because Summit's contract was terminated by the State of South Dakota, but he later withdrew the motion to dismiss before Summit responded. *See* Docket 94 (Hughbanks's partial motion to dismiss); Docket 100 (Hughbanks's motion to withdraw and cancel his partial motion to dismiss); Docket 104 (Summit defendants' response to Hughbanks's partial motion to dismiss); Docket 114 at 23 (granting Hughbanks's motion to withdraw his partial motion to dismiss).

Summit no has a longer contract with the DOC to provide food services at the MDSP.[4] Docket 205 ¶ 3; Docket 206 at 5; Docket 208-1 at 2, 3, 8. Hughbanks also has completed his sentence and is no longer in custody or on parole. Dockets 151, 194, 195. *See also Offender Locator*, S.D. Dep't of Corr.,

---

[4] Although the record contains different dates for when Summit's contract ended, this does not pose a genuine issue of material fact. A genuine issue of fact is material if it "might affect the outcome of the suit under the governing law." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The contract with Summit has terminated, and Hughbanks has been released; he is no longer subject to the conditions of confinement. Thus, in this instance, the ending date of Summit's contract does not affect the outcome of the suit and is immaterial.

https://doc.sd.gov/adult/lookup/ (last visited Sept. 3, 2024). Because Summit is no longer the food service provider and Hughbanks is no longer subjected to the conditions that give rise to his claims for declaratory and injunctive relief, the Summit defendants contend that Hughbanks's claims for declaratory and injunctive relief are moot and should be dismissed. Docket 206 at 3.

"[A] prisoner's claim for injunctive [and declaratory] relief to improve prison conditions is moot if he or she is no longer subject to those conditions." *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) (citing *Wycoff v. Brewer*, 572 F.2d 1260, 1262 (8th Cir. 1978)). Because Summit no longer provides food services to the MDSP and Hughbanks is no longer in custody, his claims for injunctive and declaratory relief are moot and dismissed. *See Brazil v. Ark. Dep't of Human Servs.*, 892 F.3d 957, 960–61 (8th Cir. 2018) (recognizing that when an issue is moot, a court must dismiss the claim for lack of jurisdiction); *Smith v. Hundley*, 190 F.3d 852, 855 (8th Cir. 1999) (holding that an inmate's claims for declaratory relief in a § 1983 action are moot if the inmate is transferred and no longer subject to the alleged unlawful policies and conduct). Summit defendants are entitled to summary judgment on Hughbanks's claims for injunctive and declaratory relief, and the official capacity claims are dismissed.

## C.   Legal Standard

"[T]he Constitution 'does not mandate comfortable prisons'; it prohibits 'inhumane ones.' " *Williams v. Delo*, 49 F.3d 442, 445 (8th Cir. 1995) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). The United States Supreme

Court has clarified that only "extreme deprivations" that deny "the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citation and internal quotation omitted). The Supreme Court has listed as basic human needs "food, clothing, shelter, medical care, and reasonable safety[.]" *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (internal quotation omitted). In order to prevail on an Eighth Amendment conditions of confinement claim, a prisoner must prove that: (1) objectively, the deprivation was sufficiently serious to deprive him of the minimal civilized measures of life's necessities, or to constitute a substantial risk of serious harm to his health or safety; and (2) subjectively, the defendants were deliberately indifferent to the risk of harm posed by the deprivation. *Simmons v. Cook*, 154 F.3d 805, 807 (8th Cir. 1998) (citing *Farmer*, 511 U.S. at 834). An Eighth Amendment challenge to conditions of confinement must examine the totality of the circumstances. *Villanueva v. George*, 659 F.2d 851, 854 (8th Cir. 1981). Even if no single condition would be unconstitutional in itself, the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment. *See id.*; *see also Tyler v. Black*, 865 F.2d 181, 183 (8th Cir. 1989).

### D.   Claims Against Anderson and Halverson

#### 1.   Sanitation

Hughbanks alleges that Anderson and Halverson allowed unsanitary conditions and inadequate climate control, which resulted in an infestation of flies in the dietary building. Docket 20 at 31. He also alleges that Anderson and

Halverson negligently overlooked and allowed dirty floors in the dietary building. *Id.* at 35. He also alleges that Anderson and Halverson "are responsible for not having enough utensils, not having a soak solution set-up, and allowing racks to be overloaded[,]" which caused unsanitary and insufficient eating utensils. *Id.* at 40. Hughbanks has not exhausted his conditions of confinement claims about the infestations of flies and unsanitary utensils and tables, but, even if he had exhausted these claims, Anderson and Halverson would be entitled to summary judgment.

The DOC had approval and oversight over all kitchen sanitation policies and made all final decisions regarding sanitation requirements. Docket 205 ¶¶ 5–7, 9. Employees working with food received training to comply with DOC standards. *Id.* ¶ 9. Summit received passing health inspection scores during the relevant years of 2020 through 2022. *Id.* ¶ 17; Docket 208-1 at 141–46. There is no evidence showing that Anderson and Halverson allowed unsanitary conditions. The undisputed facts do not show an extreme deprivation that posed a substantial risk of serious physical harm to Hughbanks.

Further, Hughbanks requests damages against Anderson and Halverson because they negligently overlooked and allowed dirty floors in the dietary building. Docket 20 at 35. Negligence, even gross negligence, is not actionable under the Eighth Amendment. *Newman v. Holmes*, 122 F.3d 650, 653 (8th Cir. 1997) ("deliberate indifference includes something more than negligence but less than actual intent to harm"). For these reasons, Anderson and Halverson are entitled to summary judgment on these claims.

14

### 2.    Nutrition

Hughbanks alleges that Anderson and Halverson provide inadequate nutrition in violation of the Eighth Amendment. Docket 20 at 73–75. He claims that on five occasions Summit substituted food with food of lower quantity and nutrition. *Id.* Inmates have a right to adequate nutrition, and the failure to provide adequate nutrition may constitute deliberate indifference in violation of the Eighth Amendment. *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992). An inmate alleging an inadequate diet under the Eighth Amendment must demonstrate that he lost significant weight or suffered adverse physical effects from lack of nutrition or was denied a nutritionally or calorically adequate diet. *Id.*; *see also Ingrassia v. Schafer*, 825 F.3d 891, 899 (8th Cir. 2016); *Davis v. Missouri*, 389 F. App'x. 579, 579 (8th Cir. 2010) (per curiam) (collecting cases).

Diets complied with the NIH's Dietary Recommended Intakes and Recommended Dietary Allowances Guide. Docket 205 ¶ 9. Diets contained a weekly average of 2,700 calories and 120 grams of protein. *Id.* All menu substitutions were approved by the DOC. *Id.* ¶ 19. Hughbanks's health records show that he was well nourished. *Id.* ¶ 20. There is no evidence before the court showing that Hughbanks was not provided nutritionally adequate meals or that he lost significant weight or suffered adverse physical effects due to lack of nutrition. Thus, Anderson and Halverson are entitled to summary judgment on this claim.

### E.     Claims Against Summit

Summit was an independent contractor that contracted with the State of South Dakota to provide food services in DOC facilities. Docket 208-1 at 15. Many courts have found that private companies that contracted to provide food services at correctional facilities act under color of state law for purposes of § 1983. *Mozden v. Helder*, 2014 U.S. Dist. LEXIS 90129, at *7–8 (W.D. Ark. Apr. 8, 2014) (collecting cases) adopted by 2014 U.S. Dist. LEXIS 91295 (W.D. Ark. July 2, 2014). *See also West v. Atkins*, 487 U.S. 42, 49–51 (1988) (holding that a private company that contracted with a prison to provide medical services acts under color of state law for purposes of § 1983). The Eighth Circuit has held that a "corporation acting under color of state law is liable under § 1983 for its own unconstitutional policies . . . [the] proper test is whether there is [a] policy, custom, or action by those who represent official policy that inflicts injury actionable under § 1983[.]" *Burke v. N.D. Dep't of Corr. & Rehab.*, 294 F.3d 1043, 1044 (8th Cir. 2002) (per curiam) (citing *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975–76 (8th Cir. 1993)). In order to prove a policy, custom, or official action, the plaintiff must show (1) "a continuing, widespread, persistent pattern of unconstitutional misconduct" by the corporation's employees; (2) "deliberate indifference to or tacit authorization of such conduct by [the corporation's] policymaking officials after notice to the officials of that misconduct;" and (3) the plaintiff "was injured by acts pursuant to [the corporation's] custom, i.e., that the custom was the moving force behind the constitutional violation." *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388

F.3d 588, 590–91 (8th Cir. 2004) (quoting *S.J. v. Kansas City Mo. Pub. Sch. Dist.*, 294 F.3d 1025, 1028 (8th Cir. 2002)).

### 1.    Sanitation

Hughbanks alleges that Summit allowed unsanitary conditions and lack of adequate climate control, which contributed to an infestation of flies in the dietary building. Docket 20 at 31. He also alleges that Summit allowed the floors in the dietary building to become unsanitary. *Id.* at 33–35. He alleges that utensils and tables in the dietary building are unsanitary and that Summit, Anderson, and Halverson "are responsible for not having enough utensils, not having a soak solution set-up, and allowing racks to be overloaded." *Id.* at 40. Hughbanks has not exhausted his conditions of confinement claims about the infestations of flies and unsanitary utensils and tables, but, even if he had exhausted these claims, Summit would be entitled to summary judgment.

Kitchen sanitation policies are established according to Summit's contract with the DOC, and the DOC has final approval and oversight of all policies and decisions about sanitation. Docket 205 ¶¶ 5–7, 9, 12. All employees assigned to prepare and serve food and clean the kitchen and dining areas were provided training to comply with DOC standards. *Id.* ¶ 9. There is no evidence of any conditions that rise to the level of an Eighth Amendment violation. Further, there is no record evidence of a Summit policy, custom, or action that inflicted an injury on Hughbanks that is actionable under § 1983. Thus, Summit is entitled to summary judgment on this claim.

### 2.     Nutrition

Hughbanks alleges that on multiple occasions Summit ran out of food and substituted items that were of lower quantity and nutritional value. Docket 20 at 73–75. He also alleges that the diets that Summit provided did not provide sufficient vitamins and minerals, which compromised his immune system and caused deterioration and degeneration of his bones and joints. *Id.* at 75.

Menus must meet the NIH's Dietary Recommended Intakes and Recommended Dietary Allowances Guide. Docket 205 ¶ 9. All menus are evaluated at least twice annually by a licensed dietician to ensure compliance with DOC requirements and variety in the meals served. *Id.* ¶ 8. Menu and meal substitutions were approved by the DOC. *Id.* ¶ 10. DOC evaluations showed that Summit provided nutritionally adequate meals. *Id.* ¶¶ 14–15. It is undisputed that Hughbanks's health records show that he was well nourished. *Id.* ¶ 20 (citing Docket 182 ¶¶ 277–300). There is no record evidence that Summit had a policy, custom, or action to provide inmates with inadequate nutrition. *See generally id.* Thus, Summit is entitled to summary judgment on this claim.

### III.   Fluke and Warembourg's Motion for Summary Judgment

This court dismissed as moot Hughbanks's official capacity claims against Fluke and Warembourg when ruling on their prior motion for summary judgment. Docket 211 at 39–40, 74. Thus, the only outstanding claim against Fluke and Warembourg is a First Amendment claim against them in their

individual capacities for damages arising out of alleged rejection of correspondence from Bethel University and STC. *See id.* at 65–66, 74.

### A.    Timeliness of Motion

Fluke, Warembourg, and the other defendants employed by the State of South Dakota moved for summary judgment on all of Hughbanks's claims against them except for Hughbanks's claim against Fluke and Warembourg that alleged that the DOC's inmate correspondence policy is unconstitutional as applied. *See id.* at 65–66. Because Fluke and Warembourg's motion for summary judgment did not address the First Amendment as applied challenge, this court denied Fluke and Warembourg's motion for summary judgment on that claim. *Id.* On June 11, 2024, Fluke and Warembourg filed a second motion for summary judgment, seeking summary judgment on the outstanding claim. Docket 213. The court's deadline for a party to move for summary judgment was October 26, 2023. Docket 142 at 4.

Federal Rule of Civil Procedure 6(b)(1)(B) permits the court to extend the time for a party to submit a filing "if the party failed to act because of excusable neglect." "Excusable neglect is an 'elastic concept' that empowers courts to accept, 'where appropriate, . . . late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control.' " *Chorosevic v. MetLife Choices*, 600 F.3d 934, 846 (8th Cir. 2010) (alteration in original) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 392, 388 (1993)).

19

Fluke and Warembourg claim that they inadvertently overlooked the outstanding First Amendment claim against them in their initial motion for summary judgment. Docket 214 at 5. Although Fluke and Warembourg did not seek leave of court to file their second motion for summary judgment after the motion deadline, they have established good cause and excusable neglect for their late filing. Hughbanks did not object to Fluke and Warembourg's late filing of the motion for summary judgment. Thus, this court will consider Fluke and Warembourg's second motion for summary judgment, Docket 213.

### B.     Exhaustion of Administrative Remedies

It is undisputed that Hughbanks exhausted his administrative remedies on his outstanding First Amendment claim against Fluke and Warembourg. Docket 214 at 6.

### C.     Qualified Immunity Standard

Fluke and Warembourg argue they are entitled to qualified immunity because their actions did not violate Hughbanks's constitutional rights. Docket 214 at 5–6 (citing Docket 172 at 6–9). To determine whether a government official is entitled to qualified immunity, the court considers (1) whether the facts alleged, viewed in the light most favorable to plaintiff, demonstrate the official's conduct violated a constitutional right, and (2) whether the constitutional right was clearly established at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The court may consider the elements in any order, and if either of the elements is not met, then the

official is entitled to qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### D.    First Amendment Legal Standard

Inmates have a First Amendment right to receive mail. *Weiler v. Purkett*, 137 F.3d 1047, 1050 (8th Cir. 1998). But that "right may be limited by prison regulations that are reasonably related to legitimate penological interests." *Id.* In *Turner v. Safley*, the Supreme Court held that prison rules and restrictions on First Amendment rights are constitutional only "if [they are] reasonably related to legitimate penological interests." 482 U.S. 78, 89 (1987). The *Turner* Court provided four factors to determine whether a prison rule withstands scrutiny:

> (1) whether there is a valid rational connection between the regulation and the legitimate government interest it purports to further; (2) whether the inmate has an alternative means of exercising his constitutional right; (3) the impact that accommodation of the inmate's right would have upon others, including inmates as well as non-inmates; and (4) the absence of a ready alternative to the regulation.

*Thongvanh v. Thalacker*, 17 F.3d 256, 259 (8th Cir. 1994). Courts must give "considerable deference to the determinations of prison administrators who, in the interests of security, regulate the relations between prisoners and the outside world." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) (citation omitted). Deference is accorded to prison administrators because the realities of running a penal institution are complex, and courts are ill-equipped to deal with problems of prison administration. *Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 136 (1977).

### E.      Unconstitutional As Applied

Hughbanks alleges that the inmate correspondence policy is unconstitutional as applied. Docket 20 at 49–51. He alleges that Fluke directed mailroom staff to reject cardstock, including a business card and folder from Bethel University and correspondence from STC. *Id.* at 50. He alleges that Fluke sanctioned Warembourg for rejecting the folder. *Id.* Hughbanks alleges that folders are available through commissary and are handed out at activities; he also alleges that business cards are handed out by visitors and were previously allowed through the mail before Fluke and Warembourg. *Id.* Hughbanks alleges that the mail policy is unconstitutional as applied. *Id.* at 49–51. "[A] facially valid regulation, may be invalid if it is applied to the particular items in a way that negates the [prison's] legitimate concerns.' " *Murchison v. Rogers*, 779 F.3d 882, 887 (8th Cir. 2015) (quoting *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 986 (8th Cir. 2004)).

### 1.      Claim Against Warembourg

Hughbanks alleges that Fluke sanctioned Warembourg because she rejected a folder from Bethel University despite folders not being prohibited in any policy. Docket 20 at 50. But there is no evidence that Warembourg was sanctioned or that Warembourg was personally involved in rejecting the pieces of mail at issue. Docket 215 ¶¶ 12, 15. There is also no evidence that Warembourg sent Hughbanks the notice of rejection that he received. *Id.* To prevail on an individual capacity claim under § 1983, "a plaintiff must show each individual defendant's personal involvement in the alleged violation."

22

*Kingsley v. Lawrence Cnty.*, 964 F.3d 690, 700 (8th Cir. 2020) (quoting *White v. Jackson*, 865 F.3d 1064, 1081 (8th Cir. 2017)). Because there is no record evidence showing her personal involvement, Warembourg is entitled to summary judgment on the individual capacity claim against her.

### 2.    Claim Against Fluke

Hughbanks alleges that Fluke directed mail room staff at MDSP to reject incoming correspondence on cardstock, which included a business card from Bethel University, a folder from Bethel University, and correspondence from STC. Docket 20 at 50. Fluke was not personally involved in rejecting the pieces of mail at issue. Docket 215 ¶ 13. But Fluke responded to Hughbanks's request for an administrative remedy, and Fluke informed Hughbanks that "[t]he MDSP mailroom has been directed to view business cards as postcards or greeting cards and for this reason [his] correspondence has been rejected." Docket 214-1 at 1. Although the record evidence shows that Fluke was not involved with the specific rejection of Hughbanks's two pieces of mail, Docket 215 ¶ 13, the evidence also shows that Fluke was involved with the direction to mailroom staff to reject business cards.[5] Docket 214-1 at 1.

A "supervisor incurs liability for a violation of a federally protected right when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the

---

[5] Although the warden did not sign the Administrative Remedy Response and Fluke's name is not listed on the Administrative Remedy Response, Fluke's counsel filed the Administrative Remedy Response as an exhibit to their briefing. Docket 214-1 at 1. Fluke was the warden when the Administrative Remedy Response was issued. Docket 174 ¶ 1.

violation." *Ottman v. City of Independence*, 341 F.3d 751, 761 (8th Cir. 2003) (citing *Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir. 1993)). A warden may also be liable for his policy decisions regarding the allegedly unconstitutional prison conditions. *Martin*, 780 F.2d at 1338. Because the evidence shows that Fluke was personally involved with enacting the policy to reject business cards and folders, Fluke is not entitled to summary judgment in his individual capacity based on a lack of personal involvement.

In an as-applied First Amendment challenge, the court is instructed to apply the *Turner* factors to "consider 'whether a ban on *these particular items* is reasonably related to a legitimate penological objective.' " *Murchison*, 779 F.3d at 887 (quoting *Williams v. Brimeyer*, 116 F.3d 351, 354 (8th Cir. 1997)). But the court need not apply the *Turner* factors here; Fluke is entitled to qualified immunity because it cannot be said that he violated Hughbanks's clearly established right.

A right is "clearly established" if the law was sufficiently clear that every reasonable officer would understand that his conduct violated that right. *District of Columbia v. Wesby*, 538 U.S. 48, 63 (2018). Hughbanks does not cite to any authority to support that construing incoming mail that includes business cards and folders as banned items to prevent contraband from entering the prison is unconstitutional. Courts have held that return or rejection of mail based on physical deficiencies does not violate a prisoner's First Amendment right to receive mail. *Bell v. Young*, No. 4:21-CV-04134-LLP, 2022 WL 4482855, at *17 (D.S.D. Sept. 27, 2022) (did not violate First

Amendment to return mail because it contained a label in violation of DOC policies and awarded summary judgment based on qualified immunity); *Whitington v. Moschetti*, 423 F. App'x 767, 772 (10th Cir. 2011) ("[W]e have held that an inmate who challenged a policy of returning correspondence with stickers to the sender had not shown the violation of any protected right."); *Matthews v. Washington Dep't of Corrs.*, 2016 WL 1426302, at *4 (W.D. Wash. Feb. 11, 2016) (stating that return of mail based on a deficiency apparent on the envelope does not implicate the First Amendment); *Odom v. Pheral*, 2013 WL 1703868, at *8 (W.D. Ky. Apr. 19. 2013) (holding that allegation that a package was rejected because it was covered in tape fails to state a constitutional violation); *Sikorski v. Whorton*, 631 F. Supp. 2d 1327, 1348 (D. Nev. 2009); *Jeffries v. Snake River Corrs.*, 2008 WL 3200802, at *4 (D. Or. Aug. 4, 2008), *aff'd*, 362 F. App'x 587 (9th Cir. 2010) (policy that prohibits incoming mail containing stickers or certain adhesives does not violate prisoner's First Amendment right to receive mail).

Further, one inmate correspondence policy submitted in Fluke and Warembourg's first motion for summary judgment states that "[g]eneral correspondence must be on plain white copy/typing paper or lined white paper (legal paper), unless received directly from . . . [a] religious organization or educational institution. Post cards and commercial or personal greeting cards are not permitted." Docket 172-89 at 5. Hughbanks appears to allege that Fluke violated this prison policy by authorizing the rejection of his mail from Bethel University and STC. Docket 20 at 50. But merely violating prison policy

25

does not rise to the level of a constitutional violation actionable under § 1983.

*Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997). Thus, Fluke is entitled to summary judgment on this claim.

IT IS ORDERED:

1.     That Summit defendants' motions for summary judgment (Dockets 202 and 204) are granted.

2.     That Fluke and Warembourg's motion for summary judgment (Docket 213) is granted.

Dated September 17, 2024.

                             BY THE COURT:

                             /s/ *Karen E. Schreier*
                             KAREN E. SCHREIER
                             UNITED STATES DISTRICT JUDGE